[No. A113236. First Dist., Div. Three. Aug. 28, 2007.]

FRIENDS OF LAGOON VALLEY, Plaintiff and Appellant, v.
CITY OF VACAVILLE et al., Defendants and Respondents;
TRIAD COMMUNITIES, L.P., et al., Real Parties in Interest and
Respondents.

810

---

## COUNSEL

Stuart M. Flashman for Plaintiff and Appellant.

Gerald L. Hobrecht, City Attorney, and Melinda C. H. Stewart, Deputy City Attorney, for Defendants and Respondents.

Morrison & Foerster, Clark Morrison; Cox, Castle & Nicholson, Andrew B. Sabey; Baird Holm, and David C. Levy for Real Parties in Interest and Respondents.

---

## OPINION

**McGUINESS, P. J.**—Appellant Friends of Lagoon Valley filed a petition for writ of mandate challenging the approval by the City of Vacaville and the Vacaville City Council (collectively, City) of a project to develop a portion of Vacaville known as the Lower Lagoon Valley. Appellant claimed the Lower Lagoon Valley Policy Plan Implementation Project (Project) was inconsistent with the Vacaville General Plan and the Lower Lagoon Valley Policy Plan and further claimed approval of the Project's residential development violated the density bonus provisions of municipal and state law. (Gov. Code, § 65915; Vacaville Mun. Code, § 14.09.116.110 et seq.) The trial court denied the petition in a 16-page ruling and awarded $12,000 in costs to real parties in interest Triad Communities, L.P., and Lagoon Valley MPC, LLC (collectively, Triad). This appeal from the judgment and cost award followed. We conclude the City did not abuse its discretion in approving the Project and did not violate the law by awarding Triad a density bonus of 40.5 percent. We also conclude the cost award was within the trial court's discretion. Accordingly, the judgment is affirmed in its entirety.

### BACKGROUND

In August 1990, the City adopted the Vacaville General Plan (General Plan), which described the City's policies for land use, circulation, community facilities and environmental resource management. The General Plan required that development in certain areas, including the Lower Lagoon

Valley, proceed in accordance with specific policy plans. Shortly after the General Plan was adopted, the City approved the Lower Lagoon Valley Policy Plan (Policy Plan).[1] With the goal of facilitating the development of "a business park of regional significance and 'upper-end' housing" in the Lagoon Valley area, the General Plan listed several guidelines for commercial and residential development. Relevant to this appeal, the General Plan required development of the business park and highway commercial areas to be of the highest standard of quality, protecting view corridors and "the open space feel of the valley," and it limited residential development to 730 units, which were to be integrated with a golf course and a recreation complex. In general, the plan stated that development should "enhance the recreational potential of the area." Several guidelines stressed the need to protect existing views of the Lagoon Valley Lake and surrounding hills and to preserve "the open space feel of the valley."

The Policy Plan translated these guidelines into a detailed proposal for development of the region. Specifically, the Policy Plan proposed to reserve a total of 275 acres for creation of an office/business park and 49 acres for a medical complex, which would include a Kaiser hospital. Commercial development was also proposed along Interstate 80, with the possibility of a new hotel construction. The Policy Plan proposed to build 730 single-family residences in a community surrounding an 18-hole golf course, with other recreational facilities possibly to be combined with the golf course clubhouse. In addition to the golf course, the Policy Plan anticipated two major recreational uses of land: a 352-acre regional park, and a trails network in the extensive open space area bordering the Lagoon Valley. A total of 993 acres would be left as open space in the plan.

Despite these plans, no significant development occurred in the Lower Lagoon Valley during the 1990's. By 2002, however, Triad had acquired options to purchase a substantial portion of the Lower Lagoon Valley and had prepared a preliminary plan for developing the site. In June 2004, the City adopted a specific plan proposed by Triad and certified an environmental impact report (EIR) for the project. At the same time, the City approved amendments to the General Plan to implement Triad's proposal. These amendments changed the General Plan's reference to a "Business Park" to "Business Village" and updated the number of residential units permitted from 730 to 1,325.[2] Shortly after these actions, a group called Greenbelt Alliance filed suit challenging the City's approvals under the California

---

[1] The Policy Plan was first adopted in December 1990, and an amended version was approved in March 1991.

[2] The amendments also specified the recreational facilities to be included with the golf course. A new requirement was added for the creation of a berm running parallel to Interstate 80 to help screen views of the development on the valley floor.

Environmental Quality Act (Pub. Resources Code, § 21050 et seq.; CEQA). The parties eventually reached a settlement that called for the City to rescind its approvals of Triad's 2004 plan and adopt a new plan with lower overall development density and a reduction in residential units from 1,325 to 1,025. The City rescinded its approvals but, consistent with the settlement agreement, let stand its approval of the final EIR for the 2004 plan.

In January 2005, Triad submitted a revised development plan for the Lower Lagoon Valley—the Project that is challenged in this appeal. Significant aspects of the Project include: (1) construction of a business village and town center with 700,000 square feet of office space and up to 50,000 square feet allocated for retail and commercial uses; (2) development of a 338-acre residential community, with a variety of housing types integrated with a golf course and associated recreational facilities; (3) preservation of 443 acres of open space, including parks and recreational uses; and (4) creation of public uses such as a new fire station and roadways. The planned residential community would include 874 single-family homes (including 24 affordable-housing units) and 100 attached townhouses reserved for senior citizens. An additional 51 affordable-housing units would be located in the mixed-use town center.

A report of the City's planning commission explained that the Project reduced the overall development from that approved in the 2004 plan and from the guidelines set forth in the Policy Plan. Although approximately 300 more residential units would be constructed, substantially less square footage would be devoted to office space and commercial uses, and this reduced space eliminated the possibility of "big box" retail uses. The City also discussed the Project in an addendum to the previously certified EIR. No supplemental EIR was necessary, the City concluded, because the Project's smaller development area would actually reduce the potential intensity of uses in the area and thus would not produce any significant new environmental impacts. On February 22, 2005, the City approved the addendum to the EIR and the Project itself, along with the Project's vesting tentative map and planned development permit. This permit included approval of a density bonus (Gov. Code, § 65915) for the Project.

On April 7, 2005, appellant filed a petition for peremptory writ of mandate and complaint for injunctive relief against the City, naming Triad and several Lagoon Valley property owners as real parties in interest. Appellant alleged the City's approvals violated the Subdivision Map Act (Gov. Code, § 66473.5) because the Project was inconsistent with several policies expressed in the General Plan and the Policy Plan. In addition, appellant asserted the Project's residential component violated state and municipal density bonus laws. (Gov. Code, § 65915; Vacaville Mun. Code, § 14.09.116.110 et seq.) An 81-volume

administrative record, consisting of nearly 20,000 pages, was certified less than three weeks later, and the matter proceeded to hearings on August 25, 2005, and October 27, 2005. On November 18, 2005, the trial court issued a detailed ruling rejecting all of appellant's claims and denying the petition for writ of mandate and request for injunctive relief.

After judgment was entered on the order, Triad filed a memorandum of costs seeking to recover a total of $13,508.30 in costs. Nearly all of this sum—$12,841.30—consisted of costs incurred for preparation of the administrative record. These amounts were later amended, with Triad claiming a total of $18,231 in costs, $16,841.74 of which was attributed to costs for preparing the administrative record. Appellant moved to tax costs, arguing this amount was excessive because large portions of the administrative record were not relevant to the challenges raised in the petition and because portions of this record "may actually have been prepared, and associated costs already paid or forgiven, in a prior case." The trial court granted the motion in part, fixing Triad's cost recovery at $12,000.

## DISCUSSION

### I. *Project Is Consistent with Applicable Plans*

■ The Legislature has required every county and city to adopt "a comprehensive, long-term general plan for the physical development of the county or city . . . ." (Gov. Code, § 65300.) A general plan provides a " 'charter for future development' " and sets forth a city or county's fundamental policy decisions about such development. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1194 [24 Cal.Rptr.3d 543].) These policies "typically reflect a range of competing interests." (*Ibid.*) Nevertheless, a city's land use decisions must be consistent with the policies expressed in the general plan. (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 994 [21 Cal.Rptr.2d 803] (*Corona-Norco*).) " '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' [Citation.]" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570–571 [276 Cal.Rptr. 410, 801 P.2d 1161].)

While recognizing that some aspects of the Project deviated from particular planning provisions, the City determined that the Project was consistent overall with the General Plan and the more precise development guidelines of the Policy Plan. Specifically, a February 15, 2005 report of the City's planning commission concluded: "[T]he particular mix of proposed land uses, as well as specific design characteristics of the project, appears to be

consistent with the Lower Lagoon Valley Policy Plan. The Policy Plan has provisions for discretion and conditional uses which would allow for a portion of the proposed golf course to be located on lands designated [in the Policy Plan] as Office Business Park. In addition, the flexibility provided for under the State's Density Bonus statutes would also permit . . . a mixed use project where residential units can be located within the area designated for Office Business Park in the Policy Plan." The commission noted that minor inconsistencies were best addressed at the planned development stage, during which adjustments could be made to ensure that the overall goals, objectives and policies of the Policy Plan would be achieved. Accordingly, the City passed a resolution finding the Project's proposed vesting tentative map and planned development were "in accordance with the goals, objectives, and policies of the [Policy Plan], the General Plan and the Development Code." In ruling on the mandate petition, the trial court concluded these findings were supported by substantial evidence.

"[A] governing body's conclusion that a particular project is consistent with the relevant general plan carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion." (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 357 [110 Cal.Rptr.2d 579] (*Napa Citizens*); see *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 717 [29 Cal.Rptr.2d 182] (*Sequoyah Hills*).) "An abuse of discretion is established only if the city council has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence. (Code Civ. Proc., § 1094.5, subd. (b).) We may neither substitute our view for that of the city council, nor reweigh conflicting evidence presented to that body. [Citation.]" (*Sequoyah Hills, supra*, 23 Cal.App.4th at p. 717.) This review is highly deferential to the local agency, "recognizing that 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role "is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]' [Citation.]" (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 677–678 [125 Cal.Rptr.2d 745] (*SFUDP*).) Because an appellate court's task in review of a mandate proceeding is essentially the same as that of the trial court, we review the agency's actions directly and are not bound by the trial court's conclusions. (*Id.* at p. 674; *Napa Citizens, supra*, 91 Cal.App.4th at p. 357; *Save Our Peninsula*

*Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 116 [104 Cal.Rptr.2d 326] (*Save Our Peninsula*).)

Appellant argues the Project is inconsistent with both the General Plan and the Policy Plan, and the City's contrary findings are not supported by substantial evidence. Appellant's complaints center on three particular areas: (1) increased traffic and differences in traffic circulation; (2) reduced size and scale of development for the office business park; and (3) increased residential development. In addition, appellant objects that the overall layout of proposed uses is different from what was envisioned in the General Plan map.

█ " 'An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.' [Citation.]" (*Corona-Norco, supra,* 17 Cal.App.4th at p. 994.) State law does not require perfect conformity between a proposed project and the applicable general plan; "[r]ather, to be 'consistent,' the subdivision map must be 'compatible with the objectives, policies, general land uses, and programs specified in' the applicable plan. (Gov. Code, § 66473.5.) As interpreted, this provision means that a subdivision map must be 'in agreement or harmony with' the applicable plan. [Citations.]" (*Sequoyah Hills, supra,* 23 Cal.App.4th at pp. 717–718.)

"General plans ordinarily do not state specific mandates or prohibitions. Rather, they state 'policies,' and set forth 'goals.' " (*Napa Citizens, supra,* 91 Cal.App.4th at p. 378.) The plans at issue in this case are no exception. The General Plan sets forth two types of policies: guiding policies, which are "the City's statements of its goals and philosophy," and implementing policies, which describe actions consistent with these goals in as much specificity "as is appropriate given the City's current level of knowledge and agreement on each policy issue." Introductory statements in the General Plan stress the flexibility of the policies described and the ability of planning officials to balance competing policies when necessary. Thus, the General Plan states that classifications for development "serve as a *guide* for zoning," and zoning regulations, while they must be consistent with the plan, "*need not be identical* to it." The Policy Plan adopted to implement the General Plan's policies for the Lagoon Valley area continues this theme of flexibility. After noting that the guiding policies and the implementing policies of the General Plan generally do not identify responsibilities or set a timeframe for development, the Policy Plan explains that "[b]oth sets of policies *allow for flexibility and require interpretation* by staff and the City's decision makers."

A. *Increased Traffic*

Appellant's primary claim of inconsistency concerns the increased levels of traffic expected to result from the Project. A transportation impact analysis

prepared for the City in February 2005 concluded that traffic generated by the Project's development would not *in itself* cause significant impacts on intersections, freeway segments or freeway ramps or merge points; however, by the year 2025, the Project was expected to contribute to significant cumulative traffic impacts at several locations.[3] The analysis proposed a mitigation plan for some of these locations, but, because freeway segments and freeway ramps are within the jurisdiction of the California Department of Transportation (Caltrans), the City could not implement mitigation measures for these areas on its own. Thus, the February 2005 EIR addendum, which was approved by the City and has not been challenged, identified certain significant and unavoidable transportation impacts from the Project occurring by the year 2025. Over the next 20 years, the Project would contribute to degradation reaching an unacceptable level of service on a segment of Interstate 80 and two freeway off-ramps, and to peak-hour traffic at certain intersections. To mitigate these impacts, Triad agreed to make a "fair share contribution," equal to the City's traffic impact fee, to pay for improvements to the freeway ramps, widening of the freeway and offsite road improvements needed to accommodate cumulative traffic at certain City intersections.

A land use policy in the General Plan (not specific to the Lagoon Valley area) states that the City will "not permit development of such intensity or density that, if built without commensurate transportation or other infrastructure improvements, the resulting water and sewer service requirements and traffic generated will create substantial problems or unacceptable levels of service, *unless an acceptable mitigation program to provide these services is implemented.*" Elsewhere, the General Plan states that developers should be required to pay their "fair share" for improvements to public facilities, including streets, bridges and traffic signals, made necessary by the new development. Financial contribution to an improvements program has been recognized as a reasonable plan for mitigation of adverse impacts under CEQA. (See *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 363–366 [46 Cal.Rptr.3d 355, 138 P.3d 692] [contribution to fee-based mitigation program was a satisfactory mitigation measure under CEQA]; *Save Our Peninsula, supra*, 87 Cal.App.4th at pp. 136–141 [payments to county's traffic impact fee program were sufficient mitigation under CEQA for project that contributed to cumulative traffic impacts on highway and other roadways].)

Consistent with these authorities, we conclude the City did not abuse its discretion in concluding the Project's payment of traffic impact fees was a reasonable mitigation program. Appellant complains there is no guarantee the mitigation measures will ever be implemented, alluding to "the current

---

[3] Unacceptable traffic conditions were expected at several locations by 2025 in any event, but implementation of the Project would add more traffic and contribute to the impact.

funding situation of the state in general, and Caltrans in particular."[4] While it is true that a mere commitment to pay fees is inadequate if the fees bear no relation to actual mitigation (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 140), that is not the case here. The Project will contribute money to specific mitigation measures, which are described in the EIR addendum. Moreover, as noted in the transportation impact analysis prepared for the Project, the City and Caltrans will be cooperating to prepare a project study report for the freeway ramp improvements described in the EIR. "All that is required by CEQA," or by the wording of the City's General Plan, "is that there be a reasonable plan for mitigation. [Citations.]" (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 141.) Nothing required the City to set forth a time-specific schedule for the completion of specific roadway improvements. (*Ibid.*; see also *City of Marina v. Board of Trustees of California State University, supra,* 39 Cal.4th at pp. 364–365 [uncertainties affecting implementation of improvements did not render a fee-based mitigation plan inadequate under CEQA].)

The holding in *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777 [32 Cal.Rptr.3d 177] (*Endangered Habitats*) does not require us to reach a different result. Unlike the flexible General Plan provisions at issue in this case, the general plan in *Endangered Habitats* required the maintenance of specific levels of service at certain intersections as computed using a specific methodology. (*Id.* at pp. 782–783.) Although an EIR determined cumulative traffic impacts were not significant under a different methodology, the court remarked this fact was "of no import" given the unambiguous requirements of the general plan. (*Id.* at p. 783.) The court also concluded the developer's contribution to a fee program was not a sufficient mitigation plan because there was no evidence of what improvements would actually be funded by the fees. (*Id.* at p. 785; see also *Napa Citizens, supra,* 91 Cal.App.4th at pp. 379–381 [circulation plan that identified no specific means of relieving traffic congestion beyond seeking increased state funding for highway projects did not represent an "affirmative commitment[] to mitigate" adverse traffic impacts].) Here, in contrast, specific improvements are planned and described in the EIR addendum, and Triad must contribute the Project's fair share for the improvements by paying the City's traffic impact fee. Finally, a "declared purpose" of the general plan in *Endangered Habitats* was to restrict development unless adequate traffic circulation could be provided. (*Endangered Habitats, supra,* 131 Cal.App.4th

---

[4] Appellant has requested that we take judicial notice of certain asserted facts regarding the financial health and budgets of the State of California and Caltrans. We decline to do so because the asserted facts are not beyond reasonable dispute. (Evid. Code, § 452, subds. (g), (h).) However, we shall grant appellant's request and take judicial notice of the legislative history materials and municipal ordinances included in the joint appendix and attached to the request for judicial notice.

at pp. 782–783.) Preventing traffic congestion on Interstate 80 and freeway exchanges was not a central policy stated in the General Plan or Policy Plan.

Appellant also argues the Project violates certain guiding policies in the transportation element of the General Plan. Although appellant seeks to characterize these guiding policies as rigid mandates on the minimum levels of service that must be maintained at all intersections and exchanges, the policies actually afford the City a high degree of flexibility in balancing traffic circulation and land use considerations. The General Plan states that development should "[s]*trive* to maintain LOS C[5] as the minimum standard at all intersections, interchanges and road links." A related guiding policy indicates LOS D is permissible as an interim level of service while improvements are being undertaken to bring service up to LOS C or better, or alternately the City has discretion to approve LOS D as an allowable standard for the year 2020 "for infill areas or isolated situations where existing development or other practical considerations limit improvements." The General Plan also gives the City authority to approve service at LOS E or F if the city council makes certain findings at a public hearing. One situation in which the General Plan authorizes approval of LOS E or F as a permanent condition occurs when (1) the affected intersection or exchange is in "an infill or isolated area"; (2) "[t]here is no practical and feasible way to mitigate the lower level of service"; and (3) "[t]he project resulting in the lower level of service is of clear, overall public benefit."

The record indicates Lagoon Valley is a rural and geographically isolated area, and "practical considerations" unquestionably limit the City's ability to improve traffic circulation in the problem areas. The only roadways, intersections or exchanges expected to degrade below LOS C by the year 2025 are those connected with Interstate 80, where the City does not have jurisdiction to implement mitigation measures unilaterally. Under these circumstances, the most the City could do was require the developer to contribute funding for future mitigation projects the City would pursue in cooperation with Caltrans. Appellant claims the City had no discretion to approve a project that resulted in unacceptable levels of service, but, as we have noted, the transportation policies in the General Plan give the City flexibility to allow reduced service levels if the project is beneficial and there is no feasible way to improve the LOS with mitigation. Moreover, appellant's interpretation would effectively prevent the City from approving *any* development in the Lower Lagoon Valley because, according to the transportation impact analysis, unacceptable levels of service are expected in 2025 at nearly all of the same freeway segments, ramps and intersections identified in the EIR addendum *even*

---

[5] "LOS" stands for "level of service," the standard for measuring traffic circulation flow. Levels of service are described in the range A through F, with LOS A, B and C indicating conditions under which traffic can move freely, with minimal delays.

*without implementation of the Project.* In other words, given that the "2025 Future Baseline" for these roadways was projected to be at LOS D or lower, appellant's rigid reading of the General Plan would essentially rule out development in the area—a result that is certainly at odds with the policies expressed in the General and Policy Plans.

## B. *Reduced Office Business Park Development*

Appellant's complaint about the reduced size of the office business park in the Project, as compared with the development envisioned in the Policy Plan, does not establish an inconsistency. The Policy Plan proposed to construct an office business park and a large hospital complex totaling over 4 million square feet, whereas the Project's business village will cover only 700,000 square feet. This difference in square footage, while significant, does not in itself violate the City's plans. Indeed, the General Plan recognized that the balancing of policies could affect the City's ability to implement certain development projects fully, and it explicitly provided: "The City has no obligation to approve projects at the maximum permitted density." The General Plan expressly recognized that policies such as preserving natural habitats or maintaining desirable traffic levels of service, for example, could "limit development on particular sites in ways not apparent from the Plan diagram." Moreover, although the square footage of the office business park deviates from the particular proposal described in the Policy Plan, it is not inconsistent with any guideline stated in the General Plan. The relevant implementing policy requires that a plan for the Lower Lagoon Valley "facilitate development of a business park *of regional significance* and 'upper-end' housing." The General Plan does not specify any required square footage, but requires only that the business park's construction be "of the highest standard of quality," preserving view corridors and the "open space feel of the valley."[6] It was within the City's discretion to conclude that the development proposed in the Project is a regionally significant business park based on the unique style and high quality of its design. The Project's office business park employs high quality design and will continue the architectural "village" theme of the valley's residential developments. Office and commercial areas will be extensively landscaped and connected by a network of plazas and walkways, making the area pedestrian oriented and arguably more compatible with the valley's "open space feel" than a larger scale development might have been.

---

[6] The General Plan also required the business park and other commercial development to "accommodate employee-service commercial uses." Consistency with this guideline is not disputed.

## C. *Increased Residential Development*

■ A corollary to appellant's complaint about the decreased size of the office business park is its complaint about the increased number of residential units approved for the Project as compared with the General and Policy Plans. Appellant argues land uses originally envisioned as business or commercial in nature have effectively been shifted to residential uses in violation of the relevant planning documents. This argument construes the policies expressed in the plans too rigidly and ignores the flexibility City officials have in implementing them. The City had broad discretion to balance the many competing policies expressed in the General Plan—such as the development of upscale housing and office and commercial construction, and the preservation of open space, views and recreational facilities—in determining whether to approve the Project. The question is not whether the square footage of the proposed development matches the square footage envisioned for various uses in planning documents, "but whether the project is compatible with, and does not frustrate, the general plan's goals and policies." (*Napa Citizens, supra,* 91 Cal.App.4th at p. 378.) "A general plan must try to accommodate a wide range of competing interests—including those of developers, neighboring homeowners, prospective homebuyers, environmentalists, current and prospective business owners, jobseekers, taxpayers, and providers and recipients of all types of city-provided services—and to present a clear and comprehensive set of principles to guide development decisions. Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions." (*Sequoyah Hills, supra,* 23 Cal.App.4th at p. 719.)

Substantial evidence supports the City's conclusion that the residential development proposed in the Project is compatible with General Plan goals and policies. "Balance does not require equivalence, but rather a weighing of pros and cons to achieve an acceptable mix." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1268–1269 [15 Cal.Rptr.3d 176].) The General Plan requires only that development of the Lower Lagoon Valley will include a regionally significant business park and "upper-end" housing, and it lists several requirements for achieving these goals. Consistent with the General Plan, the residential villages in the Project will consist almost entirely of upscale single-family homes, which will be integrated with a "championship style" golf course and recreational complex. The Project also brings a substantial number of income-restricted and senior housing units to the

Lagoon Valley, many of which will be integrated with the business village.[7] State law encourages cities to provide such affordable housing through incentives to developers (e.g., Gov. Code, § 65915), and the Policy Plan gives planning officials leeway to permit mixed uses like the townhouses located in the business village so long as they are consistent with the Policy Plan and do not impair other permitted uses.

### D. *Layout*

Finally, appellant's complaint that the layout of land uses in the Project differs from the General Plan's land use and circulation map is anticipated and answered by the General Plan itself. Although a diagram had been prepared illustrating the policies of the plan, the General Plan cautioned that this map was presented only as "a general illustration of the policies of the General Plan" and was "not intended to reflect every policy direction." The General Plan anticipated that review of applicable policies would be "necessary to determine [the] precise land use potential of any site." Division Two of this court rejected a similar claim of inconsistency because Oakland's general plan "confer[red] upon city officials some discretion to diverge from the details of the Map, so long as the variation serve[d] the plan's policies and objectives as well or better." (*Sequoyah Hills, supra,* 23 Cal.App.4th at pp. 718–719.) Because the General Plan's map was likewise intended to be a guideline, not a mandate, we conclude the City did not abuse its discretion in approving a somewhat different layout of uses than was originally envisioned for the Lagoon Valley.

### II. *The Density Bonus Complies with State Housing Law*

Appellant next claims the City violated state housing law and corresponding municipal ordinances by granting Triad a density bonus of over 40 percent. We conclude the City had discretion to award a density bonus higher than the maximum amount set forth in the applicable statute, Government Code section 65915 (Section 65915 in text or Density Bonus Law). We also reject appellant's challenge to the City's calculation of the density bonus.

### A. *Interpretation of the Density Bonus Law*

In 1979, the Legislature added several provisions to the Planning and Zoning Law (Gov. Code, § 65000 et seq.) to address the shortage of affordable housing in California. (Gov. Code, § 65913, subd. (a); see also *Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744, 770

---

[7] Twenty-four of the 874 homes in the villages will be affordable units for moderate-income families. Additional affordable housing is located in the business village.

[33 Cal.Rptr.2d 137] [concluding these statutes "show an important state policy to promote the construction of low income housing and to remove impediments to the same"]; *Hansen v. Department of Social Services* (1987) 193 Cal.App.3d 283, 296–297 [238 Cal.Rptr. 232] [discussing legislative efforts to remedy statewide shortage of housing for low- and moderate-income families].) One of these statutes, Section 65915, offers incentives to developers to include low income housing in new construction projects. Although application of the statute can be complicated, its aim is fairly simple: When a developer agrees to construct a certain percentage of the units in a housing development for low- or very-low-income households, or to construct a senior citizen housing development, the city or county must grant the developer one or more itemized concessions and a "density bonus," which allows the developer to increase the density of the development by a certain percentage above the maximum allowable limit under local zoning law. (Gov. Code, § 65915, subds. (a), (b).) In other words, the Density Bonus Law "reward[s] a developer who agrees to build a certain percentage of low-income housing with the opportunity to build more residences than would otherwise be permitted by the applicable local regulations." (*Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1263 [2 Cal.Rptr.3d 739].)

■ The version of Section 65915 in effect during the relevant time period mandated that local governments provide a density bonus when a developer agreed to construct 10 percent of total units for lower-income households, 5 percent of total units for very-low-income households, a senior citizen housing development (as defined in Civ. Code, §§ 51.3, 51.12), or 10 percent of units in a planned development (Civ. Code, § 1351, subd. (k)) for moderate-income households. (Gov. Code, § 65915, subd. (b) [2005 version].) For developers who provided low-income units, very-low-income units or senior citizen housing, the density bonus was required to be an increase of at least 20 percent over the otherwise maximum residential density allowed under a local zoning ordinance or general plan. (Gov. Code, § 65915, subd. (g)(1) [2005 version].) The density bonus could be lower only if the developer agreed to accept a lesser percentage. (*Ibid.*) The statute further directed that, for every percentage point increase in low-income housing units the developer provided above the minimum amounts stated in subdivision (b), the city or county had to increase the amount of the density bonus by 1.5 percent "up to a maximum of 35 percent." (*Ibid.*)[8] A similar sliding scale applied to developers who constructed moderate-income housing, except that the minimum density bonus for such housing was set at 5 percent, not 20 percent. (Gov. Code, § 65915, subd. (g)(2) [2005 version].)

---

[8] A greater density bonus increase—of 2.5 percent—was required for every percentage point increase in housing for very-low-income households.

Appellant contends this language describing 35 percent as a "maximum" value precluded the City from granting Triad a density bonus of just over 40 percent. However, this argument is undermined by subdivision (n) of Section 65915, which stated (and continues to state): *"Nothing in this section shall be construed to prohibit a city, county, or city and county from granting a density bonus greater than what is described* in this section for a development that meets the requirements of this section or from granting a proportionately lower density bonus than what is required by this section for developments that do not meet the requirements of this section." (Italics added.)

■ The primary goal in construing a statute is to ascertain legislative intent so as to effectuate the purpose of the law. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67, 743 P.2d 1323].) To do so, we first examine the language of the statute, giving the words their ordinary, commonsense meaning and according significance to all words used, if possible. (*Id.* at pp. 1386–1387; *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 119 [113 Cal.Rptr.2d 90].) "The statute's words generally provide the most reliable indicator of legislative intent; if they are clear and unambiguous, '[t]here is no need for judicial construction and a court may not indulge in it.' (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].)" (*Lewis v. County of Sacramento, supra,* 93 Cal.App.4th at p. 119; see also *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1505 [86 Cal.Rptr.2d 43].)

■ Although the calculations described are complicated, in our view the language of Section 65915 is clear and unambiguous. If a developer agrees to dedicate a certain percentage of the overall units in a development to affordable or senior housing, the Density Bonus Law requires the municipality to grant the developer a density bonus of *at least* a certain percentage, ranging from a low of 5 percent (for moderate-income housing) or 20 percent (for senior and all other affordable housing) to a maximum of 35 percent, depending on the number of affordable-housing units provided over the minimum number necessary to qualify for a bonus. (Gov. Code, § 65915, subd. (g).) Because the statute imposes a mandatory duty on local governments, and provides a means for developers to enforce this duty through civil proceedings (Gov. Code, § 65915, subd. (d)(3)), it is clear that 35 percent represents the maximum amount of bonus a city is *required to provide*, not the maximum amount a developer can ever obtain. The entire aim of Section 65915 is to provide incentives to developers to construct housing for seniors and low-income families. (See Stats. 1979, ch. 1207, §§ 1–6, p. 4738 [legislative findings and declarations supporting enactment of Gov. Code, § 65915].) It would undermine this policy to interpret subdivision (g) as imposing an absolute cap, since such a rule would prevent developers from negotiating to obtain a

higher density bonus in exchange for including even more low- income or senior housing than is provided for in Section 65915. Indeed, this may describe what happened in the present case, since the Project includes both senior housing and moderate-income housing.

■ The plain language of Section 65915, subdivision (n) also supports our interpretation because it clearly states that Section 65915 may not be construed to prohibit a local government from granting a larger density bonus than is provided for in the Density Bonus Law. Nevertheless, appellant argues subdivision (n) applies only when a municipality enacts an ordinance to provide a higher density bonus. Thus, appellant insists, the density bonus awarded here violated Section 65915 because the City did not grant it by way of an ordinance. Nothing in the Density Bonus Law suggests that a municipality must enact an ordinance any time it wishes to provide more of a density bonus than is required by state law. If the Legislature had intended to require an ordinance in such situations, it could easily have said so, and it is not the court's place to insert words into the statute. ■ "An appellate court should be 'loathe to construe a statute which has the effect of "adding" or "subtracting" language.' [Citation.]" (*People v. Pecci, supra,* 72 Cal.App.4th at p. 1504, fn. omitted; see also *Jurcoane v. Superior Court* (2001) 93 Cal.App.4th 886, 894 [113 Cal.Rptr.2d 483].) Moreover, setting up an additional hurdle for municipalities to clear (i.e., passing an ordinance) under these circumstances would be contrary to the spirit of the Density Bonus Law, which is designed to encourage, even require, incentives to developers that construct affordable housing.

■ To support its contrary arguments, appellant offers isolated statements from the legislative history of the 2004 amendments to Section 65915 and subsequent amendments to the statute. Resort to extrinsic sources of legislative intent is appropriate only when statutory language is ambiguous or is shown to have a latent ambiguity. (*Lewis v. County of Sacramento, supra,* 93 Cal.App.4th at p. 119.) ■ While we believe the language of Section 65915 is clear, we have examined the legislative history of the 2004 amendments in an abundance of caution, keeping in mind that the language of a statute bears far more significance than statements by committee members or interested parties. " '[I]t is the language of the statute itself that has successfully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed "into law" by the Governor. The same care and scrutiny does not befall the committee reports, caucus analyses, authors' statements, legislative counsel digests and other documents which make up a statute's "legislative history."

[¶] . . . [¶] . . . .' [Citation.]" (*Jurcoane v. Superior Court, supra*, 93 Cal.App.4th at pp. 892–893.)

On February 20, 2004, Senate Bill No. 1818 (2003–2004 Reg. Sess.) (Senate Bill No. 1818) was introduced to amend section 65915. To be entitled to a density bonus under the prior version of the law, a developer had to construct at least 20 percent of its housing units for low- or moderate-income households, or 10 percent for very-low-income households, or 50 percent for senior citizen housing. (Gov. Code, § 65915, subd. (b) [2004 version].) Senate Bill No. 1818 cut these percentages in half, thereby making it easier to qualify for a density bonus. (Sen. Bill No. 1818, as introduced Feb. 20, 2004 [amending Gov. Code, § 65915, subd. (b)].) As the law was written in 2004, local governments were obligated to grant a qualifying developer a density bonus "of at least 25 percent," unless the developer agreed to accept a smaller percentage. (Gov. Code, § 65915, subd. (g)(1) [2004 version].)[9] An amendment introduced April 1, 2004, proposed to change this definition of the required density bonus from a flat minimum value to a sliding scale, in which the density bonus a city had to grant would rise in accordance with the number of affordable-housing units a developer contributed beyond the minimum number needed to qualify. (Sen. Amend. to Sen. Bill No. 1818, Apr. 1, 2004, p. 6 [amending Gov. Code, § 65915, subd. (g)].) Under this sliding scale, the minimum value of a density bonus was changed from 25 percent to 12.5 percent, but for each percentage point of affordable housing a developer contributed over the new (lower) minimums the amended statute established, the required density bonus was increased by 1.5 percent, up to a maximum of 40 percent. (Sen. Amend. to Sen. Bill No. 1818, Apr. 1, 2004, pp. 5–6.)[10] The sponsors of the bill explained that the amendments to section 65915 were "intended to increase the flexibility and usefulness of density bonus law by both reducing the minimum percentage of targeted units needed to obtain a density bonus and by increasing the amount of density bonus that can be obtained when the percentage of targeted units is increased." (Sen. Housing & Community Development Com., Analysis of Sen. Bill No. 1818, as amended Apr. 1, 2004, p. 3.) The Assembly later amended the bill to raise the floor of the sliding scale for density bonuses from 12.5 percent to 20 percent. (Assem. Amend. to Sen. Bill No. 1818, June 29, 2004, p. 5 [amending § 65915, subd. (g)(1)].)

---

[9] A smaller minimum density bonus, of 10 percent, was required for construction of moderate income housing. (Gov. Code, § 65915, subd. (g)(2) [2004 version].)

[10] A slightly different sliding scale applied in the case of moderate-income housing, but the maximum density bonus required was also 40 percent. (Sen. Amend. to Sen. Bill No. 1818, Apr. 1, 2004 [amending Gov. Code, § 65915, subd. (g)(2)].)

Legislative history reflects that the only organizations opposed to Senate Bill No. 1818 were the California Chapter of the American Planning Association (CCAPA), the League of California Cities (League) and the California State Association of Counties (CSAC). In a July 2004 memorandum, they repeated their opposition to the density bonus range set forth in the bill and explained they "[could not] agree to go higher than 30%, unless approved by the city or county up to 40%, due to carrying capacity, lot size and other issues that will not support another 40% units beyond what was originally zoned for a site." In other words, municipalities did not want to be required to provide a density bonus over 30 percent without regard to local conditions, because conditions in some areas would not be equipped to support a greater increase in development. The organizations representing California cities and counties were willing to accept density bonus requirements up to 40 percent, but only if the increased bonus was approved by the local government granting it. Legislators never incorporated the proposals of CCAPA, League and CSAC into Senate Bill No. 1818.

On July 28, 2004, the language that became Section 65915, subdivision (n) was added to the bill. (Assem. Amend. to Sen. Bill No. 1818, July 28, 2004, p. 11.) Immediately after this amendment was made, the California Association of Realtors, a cosponsor of the bill, explained the new provision "clarified that localities can award a greater density bonus than under state law and award a lower density bonus for developments that do not qualify for a state density bonus." No mention was made of a need for local governments to enact an ordinance to award such bonuses.[11] Nor was there any mention of an ordinance in an analysis of the amended bill prepared by the Department of Finance, which stated only that the bill would "[a]llow local governments to provide density bonuses greater than the maximum standards specified in [the] statute." (Dept. of Finance, analysis of Sen. Bill No. 1818, Aug. 3, 2004, p. 3.)

In early August 2004, CCAPA, League and CSAC urged the Legislature to vote no on Senate Bill No. 1818, in part because the bill imposed a "maximum required density bonus" of 40 percent. They proposed an amendment reducing the maximum requirement to 30 percent. Legislators finally struck a compromise on August 23, 2004, when they amended the bill to reduce the top end of the density bonus scale from

---

[11] Appellant argues that, by mentioning state law, the author implied that a locality wishing to grant a higher density bonus must act by passing a local law. This interpretation is strained in the extreme. The mere existence of a state law governing density bonuses does not mean that municipalities must enact their own laws in order to award bonuses, and nothing in Senate Bill No. 1818—or the sponsor's comments about it—suggests such a requirement was intended.

40 percent to 35 percent. (Assem. Amend. to Sen. Bill No. 1818, Aug. 23, 2004, pp. 6–7 [amending Gov. Code, § 65915, subd. (g)].)

It is clear from our overview of the entire legislative history of Senate Bill No. 1818 that the 35 percent maximum density bonus level described in the bill's final version, and set forth in the 2005 version of section 65915, reflects the maximum density increase that would be statutorily imposed upon municipalities. Cities and counties were opposed to the higher percentage, and fought to reduce it, because the "maximum" density bonus value stated in subdivision (g) of Section 65915 reflects the maximum that a city or county will be required to give to developers. The legislative history simply does not support appellant's contrary interpretation. Thirty-five percent was intended as a cap on what a municipality was *required* to give; there is no indication it was ever meant to cap what a municipality had *authority* to give. Accordingly, the City's award of a density bonus for the Project of just over 40 percent was consistent with the letter and the spirit of section 65915.

Nor do we find anything in the legislative history of Senate Bill No. 1818 to support appellant's contention that the City could only award a density bonus over 35 percent by enacting a municipal ordinance. Beyond Senate Bill No. 1818, appellant also tries to support this argument with language subsequently added to Section 65915. After setting forth the density bonus required for different percentages of affordable housing, the current version of the Density Bonus Law states that the term "total units" (as used in determining percentages of housing needed to qualify for a density bonus) "does not include units permitted by a density bonus awarded pursuant to this section or *any local law* granting a greater density bonus." (Gov. Code, § 65915, subd. (g)(5), italics added.) Legislative declarations— even in "clarifying" amendments such as those enacted for Section 65915 in 2005—are not determinative, since the Legislature has no authority to interpret a statute. (*People v. Cruz* (1996) 13 Cal.4th 764, 781 [55 Cal.Rptr.2d 117, 919 P.2d 731]; *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1157, fn. 6 [278 Cal.Rptr. 614, 805 P.2d 873].) Moreover, the Legislature's mention in this context of density bonuses awarded pursuant to local "law" does not rule out the possibility that such bonuses can be awarded by other local action, and it certainly does not impose such a requirement on municipalities. Any speculation about legislative intent this phrase invites does not persuade us to depart from the unambiguous language of subdivision (n) of Section 65915, which states that *nothing* in the statute shall be construed as preventing cities or counties from granting a greater density

bonus than is required under Section 65915. (See *Howard Jarvis Taxpayers Assn. v. County of Orange* (2003) 110 Cal.App.4th 1375, 1381 [2 Cal.Rptr.3d 514] ["When statutory language is clear and unambiguous, we need not construe its meaning"].)

■ Appellant also contends the density bonus here violated certain Vacaville municipal ordinances regarding density bonuses. At the time the Project was approved, these ordinances set forth essentially the same requirements as the state Density Bonus Law prior to its amendment by Senate Bill No. 1818. (E.g., Vacaville Mun. Code, § 14.09.116.060 [providing for a density bonus of 25 percent for a development with at least20 percent low-income units, 10 percent very-low-income units or 50 percent of units reserved for senior citizens].) However, once the Legislature amended Section 65915, state law preempted inconsistent provisions in these municipal ordinances. " 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' [Citations.]" (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 [16 Cal.Rptr.2d 215, 844 P.2d 534]; see also Cal. Const., art. XI, § 7 ["A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws"]; *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 547 [277 Cal.Rptr. 1, 802 P.2d 317].)[12]

### B. *Calculation of Density Bonus for the Project*

Appellant also challenges the calculations the City offered in support of its award of a density bonus for the Project. The City's approval of a 40.5 percent density bonus was based on the Project's construction of a 100-unit age-restricted townhouse community for senior citizens and 75 units of housing for moderate-income households, and its provision of several other amenities, such as the creation of a neighborhood park, the building of a new fire station and the addition of over 70 acres to the Lagoon Valley Park.

---

[12] In a related argument, appellant insists Section 65915 did not give the City "a license to change general plan land uses," referring to differences such as reduced size of the office business park in the Project. We have concluded approval of the Project was an appropriate exercise of the City's discretion without regard to Section 65915. In this regard, however, we would add that the Density Bonus Law prohibited the City from applying a development standard that would interfere with the awarding of density bonuses or concessions, and the law expressly permitted the City to approve mixed-use zoning such as the Project included in the town center. (Gov. Code, § 65915, subds. (e), (*l*)(2) [2005 version].)

■ The 2005 version of Section 65915 required a density bonus to be granted when a developer agreed to construct a "senior citizen housing development as defined in Sections 51.3 and 51.12 of the Civil Code." (Gov. Code, § 65915, subd. (b)(3) [2005 version].) Unlike other provisions that condition a density bonus on the construction of a certain percentage of affordable housing units, this subdivision requires the construction only of a "senior citizen housing development." (*Ibid.*) Although prior law did require a certain percentage of senior housing to obtain a density bonus, Senate Bill No. 1818 was amended to change this provision after questions arose about the legality of imposing age restrictions on only a portion of a housing development. (Assem. Amend. to Sen. Bill No. 1818, June 15, 2004 [amending Gov. Code, § 65915, subd. (b)(3)]; see Assem. Com. on Housing and Community Development, Analysis of Sen. Bill No. 1818, as amended May 12, 2004, p. 5 [raising age discrimination concern and suggesting amendment to provide a density bonus for "any senior citizen project qualifying under Civil Code 51.3"].) In light of this change, appellant argues a density bonus is required only when an *entire* development project is devoted to senior citizen housing. Or, stated another way, in appellant's view a density bonus granted pursuant to subdivision (b)(3) of Section 65915 can be used only to increase the density of the senior development itself, and cannot justify density increases in other, nonsenior housing.

■ The first problem with this argument is procedural: Appellant never raised it in the administrative proceedings below. The main objection appellant raised to the City's planning commission was that the density bonus exceeded 35 percent, which appellant argued was the maximum bonus permissible under Section 65915. The Planning and Zoning Law limits issues that may be raised in a proceeding to attack a public agency's finding or determination to those that were previously raised in a public hearing or in written correspondence delivered to the agency, unless the issue could not have been raised through the exercise of reasonable diligence or the agency prevented the issue from being raised. (Gov. Code, § 65009, subd. (b)(1).) "The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review. [Citation.]" (*Napa Citizens, supra,* 91 Cal.App.4th at p. 384.) Exhaustion of administrative remedies is said to be a jurisdictional prerequisite to judicial action challenging a planning decision. (*SFUDP, supra,* 102 Cal.App.4th at p. 686; *Corona-Norco, supra,* 17 Cal.App.4th at p. 993; see also *Endangered Habitats, supra,* 131 Cal.App.4th at p. 791 [declining to consider argument that had not been raised at the administrative level].) Appellant protests that it was not as knowledgeable as

City officials about the workings of Section 65915 or the details of the Project, but it cites no evidence showing the issue about senior housing *could not have been raised* before the City approved the Project. On the contrary, when the City explained the basis for its density bonus calculations in a public hearing, appellant had an opportunity to object to these calculations but failed to do so. As such, the issue is procedurally barred. (Gov. Code, § 65009, subd. (b)(1).)

Moreover, even assuming it is not barred, appellant's claim is substantively flawed. The argument is confusing and contrary to the plain language of Section 65915. The statute states that a developer is entitled to a density bonus if it agrees to construct a "senior citizen housing development as defined in Sections 51.3 and 51.12 of the Civil Code." (Gov. Code, § 65915, subd. (b)(3) [2005 version].) Under Civil Code, section 51.3, " '[s]enior citizen housing development' means a residential development developed, substantially rehabilitated, or substantially renovated for, senior citizens that has at least 35 dwelling units." (Civ. Code, § 51.3, subd. (b)(4).) Here, Triad agreed to provide a senior citizen housing development of 100 units—nearly three times as many units as were necessary to obtain a density bonus. Thus, pursuant to former Section 65915, subdivision (g)(1) (as amended by Stats. 2004, ch. 928, § 1), Triad was entitled to a density bonus of "at least 20 percent," and the City had discretion to provide a greater bonus (Gov. Code, § 65915, subd. (n)).

Nothing in section 65915 states or suggests that the density bonus for senior citizen housing could not be applied to the development project as a whole. By construing the density bonus for senior citizen housing as authorizing increased development only of the senior housing itself, appellant eviscerates the reach of the Density Bonus Law. It is difficult to imagine what incentive a developer would have to construct senior citizen housing under appellant's interpretation. If the Legislature had intended to impose such a strict limitation on the application of density bonuses obtained by construction of senior housing, one would expect it to have said so, yet neither the statute nor the legislative history of Senate Bill No. 1818 suggests the Legislature intended the application of density bonuses obtained from senior housing construction to be any different from the application of bonuses obtained from construction of housing for low-income families.

We recognize that, under our interpretation, the senior housing provision of Section 65915 has the potential to create a windfall for developers in some circumstances. In a large-scale project with development of 2,000 units, for example, a developer would have to build 200 low-income units or 100 very-low-income units to qualify for a density bonus of 20 percent

(Gov. Code, § 65915, subd. (b)(1)(A), (B)), but could obtain the same density bonus by constructing only 35 units of senior citizen housing. (See Gov. Code, § 65915, subds. (b)(1)(C), (g)(1)–(3); Civ. Code § 51.3, subd. (b)(4).) This problem is ameliorated somewhat by the statute's imposition of higher density bonuses (up to 35 percent) for other types of affordable housing, whereas only a flat bonus of 20 percent is mandated for a senior citizen housing development. (Gov. Code, § 65915, subd. (g)(3).) This means the density bonus required due to the construction of a senior development will never be higher than the density bonus required due to the construction of low-income housing (although in some cases fewer units of senior housing will be needed to trigger the requirement of a density bonus).

### III. *Cost Award Was Appropriate*

The trial court awarded Triad costs of $12,000, nearly two-thirds of the amount it had requested. Most of these costs were incurred in preparation of the administrative record. Appellant complains the cost award is excessive because the 81-volume, nearly 20,000-page administrative record Triad prepared is grossly overinclusive and because the trial court fixed the amount of the award in an arbitrary fashion.

Triad claimed a total of $18,231 in costs, with $16,841.74 of this amount attributed to costs of preparing the administrative record. At the hearing on appellant's motion to tax costs, appellant's counsel argued over 60 percent of the record consisted of extraneous material, and he directed the court's attention to two boxes full of documents neither side had cited. Triad's counsel countered that it had an obligation to provide a complete record so that the court could review the City's approvals for substantial evidence. Given this standard of review on the mandamus petition, and the difficulty of anticipating all issues appellant would raise, Triad would have risked losing approval for the Project if the record were incomplete. At the conclusion of arguments, the trial court observed: "I think there is some merit to the motion. On the other hand, I think there is great merit to the position the City takes, and it's not possible, I believe, to determine exactly which portions of the record are relevant and should be included and those that should not." The court then stated costs would be fixed at $10,000. When the attorneys sought clarification as to whether the $10,000 was awarded for the cost of preparing the administrative record or for the entire cost bill, the court indicated Triad would be awarded its additional costs for filing fees and other charges (which were undisputed). Since these additional costs totaled almost $2,000, the court fixed Triad's cost award at $12,000.

 Code of Civil Procedure section 1094.5, subdivision (a) provides that the expense of preparing "all or any part" of the administrative record

may be recovered by the prevailing party. We review the trial court's award of costs for abuse of discretion. (*Acosta v. SI Corp.* (2005) 129 Cal.App.4th 1370, 1380 [29 Cal.Rptr.3d 306]; *Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1512 [22 Cal.Rptr.3d 429].) Under this standard, " '[t]he trial court's decision will only be disturbed when there is no substantial evidence to support the trial court's findings or when there has been a miscarriage of justice. If the trial court has made no findings, the reviewing court will infer all findings necessary to support the judgment and then examine the record to see if the findings are based on substantial evidence.' [Citation.]" (*Frei v. Davey*, *supra*, 124 Cal.App.4th at p. 1512.)

We conclude the trial court did not abuse its discretion in awarding costs of $12,000, an amount that was more than $6,000 less than Triad had claimed. Because it risked reversal of the Project's approval if the record lacked supporting evidence, Triad properly took pains to ensure the court was provided with a complete record of all relevant proceedings. A complete administrative record is important in cases brought under the Planning and Zoning Law, just as it is in CEQA cases, because the absence of substantial evidence in the record to support approval of a project will result in similarly severe consequences—i.e., reversal of the project approval. (Cf. *Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 373 [1 Cal.Rptr.3d 726] [describing the consequences in a CEQA case if project proponents fail to provide an adequate record to the court]; see also *County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 13 [6 Cal.Rptr.3d 286] [arguing, in CEQA context, that "the burden of showing prejudice from any overinclusion of materials into the administrative record must be on the project opponents, who have the most to gain from any underinclusion"].) In this case, there was a lengthy delay between adoption of the City's General Plan and Policy Plan and the final approval of a development project to implement these plans. It appears that much of the material appellant deems extraneous in the administrative record concerns earlier efforts to develop the Lagoon Valley, but these materials bear some arguable relevance to the City's interpretation of its General Plan, and the trial court was not required to penalize the developer for including them. Having weighed Triad's obligation to provide a complete record, and having considered the extent to which the record appeared overly inclusive, the trial court struck an appropriate balance by striking nearly one-third of the record preparation costs Triad had claimed. We will not interfere with this exercise of discretion, and the reduced cost award will be affirmed.[13]

---

[13] Although appellant has suggested portions of the administrative record may have been prepared in connection with a previous case, there is no evidence to support this claim. Such speculation does not establish an abuse of discretion.

## DISPOSITION

The judgment is affirmed. Appellant shall bear costs on appeal.

Pollak, J., and Siggins, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 14, 2007, S157041.