Filed 9/25/15  Verone v. City of West Hollywood CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| G.G. VERONE et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CITY OF WEST HOLLYWOOD et al.,<br><br>    Defendants and Respondents;<br><br>ACE OUTDOOR ADVERTISING, LLC et al.,<br><br>    Real Parties in Interest and Respondents. | B260238<br>(Los Angeles County<br>Super. Ct. No. BS144857) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed.

Rutan & Tucker, Robert S. Bower, John A. Ramirez and Mark J. Austin for Plaintiffs and Appellants.

Jenkins & Hogan, Michael Jenkins and Shahiedah S. Coates; Gilchrist & Rutter and A. Catherine Norian; Glaser Weil and Elisa L. Paster for Defendants and Respondents.

## I.  INTRODUCTION

Plaintiffs, G.G. Verone and West Hollywood Citizens Against Billboard Blight, appeal from the trial court's denial of their first amended mandate petition and declaratory relief and injunctive relief complaint.  Plaintiffs challenge the approval by defendants, the City of West Hollywood (the city) and its city council, of a replacement billboard (the project).  The billboard replacement request was presented by the real parties in interest, Ace Outdoor Advertising, LLC (the billboard company) and the property owners, Abraham and Madlen Moradzadeh and the Moradzadeh Family Trust.  Plaintiffs argue the project and its approval are inconsistent with the city's Zoning Ordinance and the Sunset Specific Plan.  We affirm the judgment.

## II.  EVIDENCE

### A.  Replacement Billboard Application

On August 6, 2009, Andrew Bilanzich, on behalf of the billboard company and Mr. Moradzadeh, submitted an application to the city seeking to replace the existing billboard.  The existing billboard is located at 8535 Sunset Boulevard (the project site) in the city's Sunset Specific Plan area.  The existing billboard is V-shaped and double-sided with each face being 16-feet high by 25-feet wide.  The existing 2-sided billboard sits atop a single pole and has a total height of 54 feet.  The proposed billboard is V-shaped and double-sided with each face being 14-feet high by 48-feet wide.  The proposed billboard sits atop a single pole that would be raised 14 feet for a maximum height of 68 feet.  In addition, the proposed billboard would be moved 18 feet west and rotated more than 10 degrees from the previous position of the existing billboard.

## B. Planning Commission Staff Report

On April 21, 2011, the city's planning commission staff report recommended approval of the billboard application by the planning commission. The staff report states the project is categorically exempt from the provisions of the California Environmental Quality Act. The staff report finds the project meets the Sunset Specific Plan design standards. The Sunset Specific Plan imposes the following requirements: billboards should use the industry standard of 14 feet high by 48 feet wide as a guide; existing billboards may be replaced only up to the height of the existing billboard; and billboards must not negatively impact public views. The staff report states: "The Sunset Specific Plan . . . supports billboard replacement with new angles ([p.] 134); but, the billboard must meet [Sunset Specific Plan] height limits ([pp.] 134, 137). Also, the [Sunset Specific Plan] allows for deviations from its standards if the City finds the proposal furthers the goals of the plan. The proposed replacement billboard minimizes the obstruction of views and ensures compatibility with the [Sunset Specific Plan]. The billboard is compatible with the related context of Geographic Area 4-F and furthers the goals of the Sunset Specific Plan by encouraging the construction and operation of billboards as a 'major urban design feature' along Sunset Boulevard and as a 'significant part of the street's visual character[.]'"

The staff report indicates the project departs from the standards of the Zoning Ordinance as to the allowed height with the top edge of the sign increasing from 54 to 68 feet. Zoning Ordinance section 19.34.080, subdivision (F)(4) specifies the height of the replacement billboard shall not exceed the height of the previous billboard. In addition, the project would deviate from the Zoning Ordinance section 19.34.080, subdivision (F)(4) by relocating the replacement billboard 18 feet west from its present location Zoning Ordinance requires that the location of the replacement billboard not vary more than five feet in a side-to-side or front-to-back direction from the previous location. Finally, the proposed billboard would be rotated more than 10 degrees from its previous position. Zoning Ordinance section 19.34.080, subdivision (F)(4)(c) specifies the

3

position of the replacement billboard face shall not vary more than 10 degrees of rotation from the previous position.

However, the staff report finds the proposed billboard could be permitted with the approval of a development agreement and adoption of a zone map amendment. This agreement and amendment would place the parcel in the development agreement overlay zone district. With the amendment and an approved agreement, the replacement billboard as proposed can be permitted. Under the proposed development agreement, the city would receive $10,500 every 4 weeks from the owners. The summary section of the staff report states: "The proposed Development Agreement will provide a substantial and on-going public benefit to the City, and, as conditioned in the Development Agreement will not negatively impact nearby properties. The Development Agreement also furthers the goals of the Sunset Specific Plan by encouraging the construction and operation of billboards as a 'major urban design feature' along Sunset Boulevard and as a 'significant part of the street's visual character[.]' Consequently, staff concludes that the proposed project is consistent with the Goals, Objectives and Policies of the General Plan and Sunset Specific Plan."

C. Planning Commission Hearings

At the April 21, 2011 public hearing, the planning commission continued all billboard applications including the one submitted by Mr. Bilanzich and Mr. Moradzadeh. One commissioner expressed concern there might not have been enough input from the neighboring business and residential communities. Several commissioners wanted policy direction from the city council before proceeding with approval of the proposed billboard. On May 2, 2011, the city council instructed the planning commission to review each billboard application on the request's merits. On June 2, 2011, the planning commission unanimously recommended approval of the billboard application submitted by Mr. Bilanzich and Mr. Moradzadeh. But the planning commission added a requirement that a neighborhood meeting take place before the city council hearing. The

4

planning commission found, "[T]he Zone Map Amendment is consistent with the Goals, Objectives and Policies of the General Plan and Sunset Specific plan because the signage enhances the visual mixture on Sunset Boulevard by creating a more vibrant environment."

## D. City Council Meetings

At the July 18, 2011 city council meeting, Ms. Verone opposed the project. Ms. Verone stated the proposed billboard would be less than 60 feet from her bedroom window. After public comment, the city council approved the project and conducted the first reading of the two ordinances related to its approval. The development agreement was modified to require the owners to contribute $5,000 annually to the Sunset Boulevard business improvement district. The city council directed "the applicant" to work with area residents to help mitigate any concerns regarding the project. The city council then continued the public hearing on the matter to August 15, 2011.

On August 12, 2011, the billboard company, through a consultant, Steven Afriat, submitted a letter to the city council concerning discussions with plaintiff. The letter described discussions the billboard company and Mr. Afriat had with Ms. Verone. According to Mr. Afriat, the proposed billboard would improve the view corridor from Ms. Verone's bedroom window because of the increased height and rotation of the new signage. Mr. Afriat indicated the distance between Ms. Verone's bedroom window and the closest part of the billboard was approximately 120 feet.

On the day of the August 15, 2011 city council meeting, Ms. Verone, through her attorney, Bryan C. Altman, submitted a letter opposing the project on various grounds. In part, Mr. Altman argued the project was inconsistent with the General Plan and the Sunset Specific Plan. In response to Mr. Altman's letter, city staff asserted the project did not necessitate any general plan amendment. The August 5, 2013 staff report states: "The Project includes amendment to the zoning map to zone the Project site Development Agreement Overlay Zone ('Overlay Zone'). That zoning change is

5

consistent with the site's General Plan land use designation of [Sunset Specific Plan]."
The staff report also rejects plaintiff's contention that the project is inconsistent with the
General Plan and the Sunset Specific Plan. The staff report finds: "The project is
consistent with the Sunset Specific Plan as it allows for deviations from the standards.
Specifically the plan states that 'All projects are subject to the applicable design and
development requirements, guidelines, and standards listed in this plan; however, the City
retains discretion to approve an alternative proposal upon a showing that the alternative
proposal furthers the goals stated by this plan and is *consistent with the purpose and
intent of the design and development requirements, guidelines, and standards that would
otherwise apply to the project.*' The proposed replacement billboard furthers the goals of
the Sunset Specific Plan by encouraging the construction and operation of billboards as a
'major urban design feature' along Sunset Boulevard and as a 'significant part of the
street's visual character[.]' [¶] The Project is consistent with the General Plan, because
it consists of a billboard Project that has a strong public benefit, adds to the City's image,
and stimulates the local economy (see Goal LU-16)."

The August 5, 2013 staff report adds: "The Project is consistent with the policies
and intent of the [Sunset Specific Plan]. [¶] The Project furthers the goal of the [Sunset
Specific Plan] by enhancing the excitement of the Sunset Strip without detracting from
the existing visual aesthetics. [¶] The [Sunset Specific Plan] states that 'Billboards are
one of the signature features of the Sunset Strip.' (Page 134) Maintaining the billboards
is keeping in line with creating these signature features. [¶] The Project is consistent
with the intent and purpose of the [Sunset Specific Plan] in that it enhances the visual
mixture on Sunset Boulevard, where billboards are encouraged, creating a more vibrant
environment. [¶] The Project is consistent with Part II. Section 1. Policies-8 I.1.b of the
[Sunset Specific Plan], which supports billboard replacement on single pole structures
with repositioning of the angles of the face to take advantage of view angles. The revised
angle of the Project takes advantage of view angles. [¶] The new angle of the billboards
will minimize any obstruction of views from the adjacent properties, since the back of the
billboards will no longer be visible to properties to the north in accordance with Part II.

6

Section 1. Policies-8 I.1.d. [¶] The size of each billboard face is consistent with the [Sunset Specific Plan's] policy that 'billboard size should use the industry standard of 14 feet high by 48 feet wide.' (Part II. Section 1. Policies-8 5.a.) [¶] The Project is consistent with the goals in the [Sunset Specific Plan] related to economic development because it will provide extraordinary monetary benefits to the City."

At the August 15, 2011 meeting, the city council continued the hearing on the project application to September 6, 2011, along with all the other billboard matters. At the September 6, 2011 meeting, the city council continued the hearing indefinitely. At the May 7, 2012 meeting, the city council directed staff to initiate an amendment to the Sunset Specific Plan to consider new off-site signage on Sunset Boulevard with the review and approval of a development agreement. On August 9, 2012, the city invited interested parties to submit new applications for off-site signage along Sunset Boulevard that would be reviewed concurrently with the proposed Sunset Specific Plan amendment. Subsequently, in a June 10, 2013 letter, city staff stated it would take approximately two years to develop a new process for review of off-site sign applications. The project and three other billboard proposals were placed back on calendar because they had already completed the city council's public hearing process.

At the August 5, 2013 city council meeting, Ms. Verone again opposed the project. John Ramirez, a city resident, argued it was unlawful to allow a development agreement overlay zone to override a specific plan on issues such as the billboard height. Supporting the project, Councilmembers John J. Duran and Jeffrey Prang observed the replacement billboard would open up the view corridor and provide financial benefits to the city. Regarding the project's financial benefits, Councilmember Duran stated: "[H]istorically, the City has not received any money, not a dime, of the advertising revenues that go to the advertising company and to the property owner. We – it was only recently that our City Attorney and staff came up with a creative proposal with the use of development agreements to make sure the City and our residents and our social services would receive a portion of that money, and this application will over the next 20 years bring in over – well almost $3 million to the [city] . . . ."

7

E.  City Council Approval of the Project

At the end of the August 5, 2013 meeting, the city council voted to approve the project.  The city council approved Ordinance 13-920, which adopts a zone map amendment placing the property in the development agreement overlay zoning map.  The city council also adopted Ordinance 13-921, which approves the city's development agreement with the owners.  In addition, the city council adopted Resolution No. 13-4484, which conditionally approved a billboard permit for the project.  In section 6 of Resolution No. 13-4484, the city council found the project was exempt under the Guidelines[1] for the Implementation of the California Environmental Quality Act.  Guidelines, section 15302, subdivision (b) provides the replacement or reconstruction of an existing structure or facility is exempt from environment review under specified circumstances.

Pursuant to Zoning Ordinance section 19.34.080, subdivision (F)(4), the city council made findings in section 7 of Resolution No. 13-4484.  The city council found the project was inconsistent with the Zoning Ordinance requirements with regards to the height, relocation and rotation (angle) of the replacement billboard.  However, the city council's concurrent approval of the development agreement and zone map amendment placed the property in a development agreement overlay zone.  The development agreement overlay zone allowed the project to have different developments standards than those required by the Zoning Ordinance.

The city council found the project was consistent with the Sunset Specific Plan.  Section 7, subdivision (b) of Resolution No. 13-4484 states:  "The Sunset Specific Plan . . . supports billboard replacement with new angles; but, the billboard must meet [Sunset Specific Plan] height limits.  Although the proposed replacement billboard departs from the standards of the [Sunset Specific Plan] with regards to the allowed height, with the top edge of the sign increasing from 54 feet to 68 feet, it remains

---

[1]     Future references to the Guidelines are to Guidelines for Implementation of the California Environmental Quality Act. (Cal. Code Regs., tit. 14, § 15000 et seq.)

8

consistent with the overall urban design vision, goals and objectives of the [Sunset Specific Plan]. The [Sunset Specific Plan] allows the City to retain the discretion to approve alternative proposals, provided that the alternative would be consistent with the goals stated by the Plan and the purpose and intent of the design and development requirements, guidelines, and standards. This proposal furthers the goal of the Sunset Specific Plan by enhancing the excitement of the Sunset Strip without detracting from existing visual aesthetics. The proposal is consistent with the purpose and intent of the design and development standards in that it enhances the visual mixture on Sunset Boulevard, where billboards are encouraged, creating a more vibrant environment. [Sunset Specific Plan] Page 134, Section I.1.b provides that the [Sunset Specific Plan] supports billboard replacement on single-pole structures with repositioning of the angles of the face to take advantage of view angles."

## III. PROCEDURAL HISTORY

On September 3, 2013, plaintiffs filed a mandate petition and declaratory relief complaint against defendants, the billboard company and the Moradzadehs and the trust. The first amended petition alleges the city's approval of the project violates the California Environmental Quality Act. In addition, the petition alleges the approval is inconsistent with the city's Sunset Specific Plan and Zoning Ordinance.

On July 14, 2014, the trial court held a hearing on the mandate petition. On October 1, 2014, the trial court denied the mandate petition in its statement of decision. The trial court found substantial evidence supported defendants' finding that the proposed replacement billboard is categorically exempt from California Environmental Quality Act pursuant to Guidelines, section 15302. Further, the trial court ruled the proposed billboard is consistent with the city's zoning regulations including the Sunset Specific Plan. On October 21, 2014, judgment was granted on all causes of action in favor of defendants. Plaintiffs filed their notice of appeal on November 20, 2014.

9

## IV.  DISCUSSION

### A.  Standards of Review

The rezoning of property, even a single parcel, is a quasi-legislative act subject to review under ordinary mandamus.  (*Arnel Development Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511, 521-523; *Foothill Communities Coalition v. City of Orange* (2014) 222 Cal.App.4th 1302, 1309 (*Foothill Communities Coalition*); *Avenida San Juan Partnership v. City of San Clemente* (2011) 201 Cal.App.4th 1256, 1268.)  Likewise, approval of a development agreement is a legislative act reviewed under ordinary mandamus procedures.  (Gov. Code, § 65867.5, subd. (a); *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1004 (*Neighbors*); *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 227 (*Santa Margarita*).)  A zoning exception in a development agreement is similar to rezoning legislation; thus, it is a legislative act reviewable under ordinary mandamus.  (*Neighbors, supra,* 157 Cal.App.4th at pp. 1004-1005.)  A legislative or quasi-legislative act will not be set aside unless it is arbitrary, capricious or unlawful.  (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11; *Santa Margarita, supra,* 84 Cal.App.4th at pp. 227-228.)  We review the city's actions directly and are not bound by the trial court's conclusions.  (*Foothill Communities Coalition, supra,* 222 Cal.App.4th at p. 1309; *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816 (*Friends of Lagoon Valley*).)

A local government's decision regarding consistency with a general plan is a quasi-legislative act reviewed by ordinary mandamus.  (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 514 (*San Francisco Tomorrow*); *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 (*Endangered Habitats*).)  We review for abuse of discretion the city's determination that the project is consistent with the specific plan and zoning ordinance.  (*San Francisco Tomorrow, supra,* 229 Cal.App.4th at pp. 513-514; *Friends of*

10

*Lagoon Valley, supra,* 154 Cal.App.4th at p. 816; *Endangered Habitats, supra,* 131 Cal.App.4th at p. 782.) We defer to the city's factual finding of consistency unless no reasonable person could have reached the same conclusion on the evidence before it. (*San Francisco Tomorrow, supra,* 229 Cal.App.4th at p. 514; *Endangered Habitats, supra,*131 Cal.App.4th at p. 782.)

Our colleagues in the First Appellate District, Division Three held in *Friends of Lagoon Valley, supra,* 154 Cal.App.44th at page 816: "'[A] governing body's conclusion that a particular project is consistent with the relevant general plan carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion.' (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 357 (*Napa Citizens*); see *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 717 (*Sequoyah Hills*).) 'An abuse of discretion is established only if the city council has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence. (Code Civ. Proc., § 1094.5, subd. (b).) We may neither substitute our view for that of the city council, nor reweigh conflicting evidence presented to that body. [Citation.]' (*Sequoyah Hills, supra,* 23 Cal.App.4th at p. 717.) This review is highly deferential to the local agency, 'recognizing that "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" [Citation.]' (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 677-678 (*San Franciscans Upholding the Downtown Plan*) .)" (Accord, *San Francisco Tomorrow, supra,* 229 Cal.App.4th at p. 514.)

11

The issuance of a permit is a quasi-judicial administrative action reviewed under administrative mandamus procedures. (Code Civ. Proc., § 1094.5; *Neighbors, supra,* 157 Cal.App.4th at p. 1005; *San Franciscans Upholding the Downtown Plan, supra,* 102 Cal.App.4th at p. 674.) We review the whole administrative record to determine whether the agency's findings are supported by substantial evidence and any errors of law occurred. (*Neighbors, supra,* 157 Cal.App.4th p. 1005; *San Franciscans Upholding the Downtown Plan, supra,* 102 Cal.App.4th at p. 674.) Reasonable doubts are resolved in favor of the administrative findings and determination. (*County of Los Angeles v. State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985, 997; *San Franciscans Upholding the Downtown Plan, supra,* 102 Cal.App.4th at p. 674.) The decisions of the agency are given substantial deference and the party seeking mandamus bears the burden of proving error. (*Foothill Communities Coalition, supra,* 222 Cal.App.4th at p. 1309; *San Franciscans Upholding the Downtown Plan, supra,* 102 Cal.App.4th at p. 674.) However, questions of law are reviewed de novo. (*Neighbors, supra,* 157 Cal.App.4th at p. 1005; *County of Los Angeles v. State Water Resources Control Bd., supra,* 143 Cal.App.4th at p. 997.)

## B. Overview of City's Land Use Regulations

### 1. Legal framework

The project is governed by three levels of local land use regulations: the West Hollywood General Plan 2035 (general plan); the Sunset Specific Plan; and the Zoning Ordinance. Every city must adopt a comprehensive, long-term general plan for the physical development of the city. (Gov. Code, § 65300; *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1195 (*Beck Development*).) The general plan is a constitution for future development, located at the top of the hierarchy of local government law regulating land use. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 772-773; *Foothill Communities Coalition, supra,* 222

12

Cal.App.4th at p. 1310.) After adoption of a general plan, a city may adopt a specific plan for the systemic implementation of the general plan for all or part of the city. (Gov. Code § 65450; *Beck Development Co., supra,* 44 Cal.App.4th at p. 1196.) A specific plan contains standards and criteria by which development will proceed and a program of implementation measures. (Gov. Code, § 65451, subds. (a)(3), (4); *Chandis Securities Co. v. City of Dana Point* (1996) 52 Cal.App.4th 475, 481; *Beck Development Co., supra,* 44 Cal.App.4th at p. 1196.) At the bottom of the land use regulation hierarchy is the zoning ordinance. A city controls the development and use of specific property within its jurisdiction through zoning regulations. (*Ibid;* see 9 Miller and Starr, Cal. Real Estate (3d ed. 2011) Subdivisions, § 25.8, pp. 25-30-25-31.) The zoning ordinance must be consistent with the adopted specific plan. (Gov. Code, § 65455; *Beck Development Co. v. Southern Pacific Transportation Co., supra,* 44 Cal.App.4th at p. 1196.) In addition, a development agreement must be consistent with the general and specific plans. Government Code section 65867.5, subdivision (b) provides, "A development agreement shall not be approved unless the legislative body finds that the provisions of the agreement are consistent with the general plan and any applicable specific plan." (See *Braude v. City of Los Angeles* (1990) 226 Cal.App.3d 83, 89.)

2. General plan

The city's general plan describes the Sunset Strip as "a lively stretch of Sunset Boulevard" filled with boutiques, restaurants, colorful billboards, night-clubs and legendary music venues. (General Plan, 1-18.) The general plan provides, "Specific information on each parcel may be found in the Sunset Specific Plan." (General Plan, 3-19.)

13

### 3. Sunset Specific Plan

The Sunset Specific Plan acts as a supplement to the city's general plan and Zoning Ordinance. (Sunset Specific Plan, Part I. Section 1. Introduction.) The purpose of the Sunset Specific Plan is to specify the development requirements of the general plan's Sunset Boulevard area in greater detail. (Sunset Specific Plan, Part I. Section 2. Foundation.) The Sunset Specific Plan area is divided into several geographic areas. The project is located in Area 4-F of the Sunset Specific Plan, which permits development to a maximum height of 45 feet.

The Sunset Specific Plan sets forth four goals for billboards and art advertising: "I. Encourage maintenance and location of existing and proposed billboards. [¶] II. Legalize existing billboards, and allow for creative billboards which will enhance the excitement of Sunset Strip without detracting from the existing visual aesthetics or interfering with views. [¶] III. Encourage continued use of original artwork/signage at businesses which involve the entertainment industry. [¶] IV. Allow for artwork to be incorporated into existing and proposed structures in order to enhance the visual quality of the street and reduce the number of blank walls." (Sunset Specific Plan, p. 133, Part II. Section 1. Policies-8.)

In addition, the Sunset Specific Plan details the guidelines and requirements for billboards. The Sunset Specific Plan provides, "All billboard structures may be replaced." (Sunset Specific Plan, p. 134, Part II. Section 1. Policies-8 I.1.b.) A replacement billboard is subject to a billboard permitting process. (Sunset Specific Plan, p. 134, Part II. Section 1. Policies-8 I.1.a.) The Sunset Specific Plan permits repositioning of the replacement billboard, "Application to replace an existing structure may include the repositioning of the angle of the face or the structure to take better advantage of view angles." (Sunset Specific Plan, p. 134, Part II. Section 1. Policies-8 I.1.b.) But the Sunset Specific Plan provides, "If the billboard is repositioned to change the view angle, it must be brought into compliance with the Sunset Specific Plan Height Limit for that site." (Sunset Specific Plan, p. 134, Part II. Section 1. Policies-8 I.1.c.) In

14

addition, the Sunset Specific Plan states, "If the existing billboard is higher than the Sunset Specific Plan height limit for that site, it may be replaced exactly as is to the existing height as of May 15, 1996." (Sunset Specific Plan, p. 134, Part II. Section 1. Policies-8 I.1.b.)

The Sunset Specific Plan also provides the following billboard design standards: "a. Size- Billboard size should use the industry standard of 14 feet high by 48 feet wide as a guideline. Small billboards are not encouraged. Oversized billboards (larger than the standard) are to be considered creative billboards and must go through a Creative Billboard Application. [¶] b. Height- Existing billboards may be replaced only up to the height of the existing billboard. . . . [¶] c. Views, Lighting- Billboards must not negatively impact public views. . . ." (Sunset Specific Plan, p. 137, Part II. Section 1. Policies- 8 I.5.a-c.)

Furthermore, the Sunset Specific Plan contains an alternative proposal provision for billboards and art advertising. (Sunset Specific Plan, p. 140, Part II. Section 1. Policies-8.) The alternative proposal provision states, "All projects are subject to the applicable design and development requirements, guidelines, and standards listed in this plan; however, the City retains discretion to approve an alternative proposal upon a showing that the alternative proposal furthers the goals stated by this plan, *and is consistent with the purpose and intent of the design and development requirements, guidelines, and standards that would otherwise apply to the project.*" (Sunset Specific Plan, p. 140, Part II. Section 1. Policies-8; italics added.)

### 4. Zoning Ordinance

The following Zoning Ordinance sections are relevant to this case: section 19.34.080, subdivision (F)(4); section 19.68.050, subdivision (C); and sections 19.14.010, 19.14.020 and 19.14.040. Zoning Ordinance, section 19.34.080, subdivision (F)(4) regulates replacement billboards: "Existing billboards and support structures may be replaced provided that the dimensions of the billboard are not increased and the billboard

15

is replaced substantially in the same location as the previous billboard in compliance with the following: [¶] a. The height of the replacement billboard shall not exceed the height of the previous billboard. If the previous billboard was higher than the height allowed by the Sunset Specific Plan then none of the following provisions shall apply and the billboard shall be replaced in exactly the same location and dimensions as previously existed. Notwithstanding this paragraph, the billboard may be relocated so as not to exceed the height limit and adjusted as described below. [¶] b. The location of the replacement billboard shall not vary more than five feet in a side-to-side or front-to-back direction from the previous location. . . . [¶] c. The position of the replacement billboard face shall not vary more than ten degrees of rotation from the previous position."

However, the standards and requirements in the Sunset Specific Plan supersede any conflicting billboard regulations in the Zoning Ordinance. Zoning Ordinance, section 19.68.050, subdivision (C) provides: "When a specific plan is adopted for a geographic area, the specific plan's land use designations, standards, and other requirements will supersede and control any contrary provisions of this title. Where an adopted specific plan is silent, development within the specific plan area will be implemented pursuant to the development standards and procedures in this title. All subdivision, public works projects, development agreements, and other development-related activity within a specific plan zone must be consistent with the adopted specific plan for that area."

Finally, the overlay zoning district regulations are in chapter 19.14 of the Zoning Ordinance. Zoning Ordinance, section 19.14.010 describes the purpose of the overlay zoning districts thusly, "Overlay zoning districts are intended to produce development that conforms with the land use requirements of the applicable primary zoning district, while providing flexibility in the application of development standards where important site, neighborhood, or community characteristics require particular attention in project planning." The overlay zoning district provisions control over other conflicting zoning provisions. Zoning Ordinance, section 19.14.020, subdivision (C) provides, "In the event

16

of any conflict between the provisions of this chapter and other requirements of this article, the provisions of this chapter shall control."

Among the overlay zoning districts identified in the Zoning Ordinance is the development agreement overlay district set forth in section 19.14.040. Zoning Ordinance, section 19.14.040 states: "A. *Purpose*. The [development agreement] overlay zoning district is used to identify sites and areas within the city that are subject to the requirements of adopted development agreements in compliance with Chapter 19.66 (Development Agreements). [¶] B. *Applicability*. The [development agreement] overlay zoning district may be combined with any zoning district established by Section 19.04.020 (Zoning Districts Established). [¶] C. *Allowed Land Uses*. The land uses that may be allowed on a site within the [development agreement] overlay district shall be limited to those specified in the applicable development agreement. . . . [¶] E. *Development and Land Use Standards*. Proposed development and land uses within the [development agreement] overlay district shall comply with all applicable development and land use standards and exaction requirements specified in the subject development agreement and, to the extent that they are not in conflict with the terms of the development agreement . . . . [¶] F. *Zoning Map Revision Upon Expiration.* Upon adoption of a development agreement, the Zoning Map shall be amended to apply the [development agreement] overlay district together with a notation showing the date of development agreement expiration. Upon the expiration of a development agreement, or an agreement otherwise becoming void, the Director shall amend the Zoning Map to delete the applicable [development agreement] overlay."

## C. The Project Is Consistent with the Zoning Ordinance

Plaintiffs contend the city's approval of the proposed billboard violates the Zoning Ordinance's requirement that all new billboards be erected in conjunction with new construction. (Zoning Ordinance, §19.34.080, subd. (F)(3)(c).) Plaintiffs assert the proposed billboard is in effect a new billboard because it exceeds the replacement

17

billboard parameters of the Zoning Ordinance. We disagree. The proposed billboard cannot be a new billboard because it replaces an existing one. (Zoning Ordinance, §19.34.080, subd. (F)(4).) Moreover, plaintiffs acknowledge they do not challenge the trial court's finding that the project is categorically exempt from the California Environment Quality Act as a replacement billboard. Thus, plaintiffs are precluded from arguing that the project is a new billboard. (*Gonzales v. R.J. Novick Constr. Co., Inc.* (1978) 20 Cal.3d 798, 804-805; *People v. Rosas* (2010) 191 Cal.App.4th 107, 117 [partial appeal abandons right to appellate review of parts of a judgment that were not appealed]; *ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1015.)

Plaintiffs also argue the project is inconsistent with the Zoning Ordinance as to the height, location, view angle and size of the proposed billboard. The proposed billboard exceeds the height of the previous billboard by 14 feet. (Zoning Ordinance, §19.34.080, subd. (F)(4)(a) ["The height of the replacement billboard shall not exceed the height of the previous billboard."]) In addition, the proposed billboard will be relocated 18 feet west of the existing billboard. (Zoning Ordinance, §§ 19.34.080, subd. (F)(4)(a) ["If the previous billboard was higher than the height allowed by the Sunset Specific Plan . . . the billboard shall be replaced in exactly the same location and dimensions as previously existed."]; 19.34.080, subd. (F)(4)(b) ["The location of the replacement billboard shall not vary more than five feet in a side-to-side or front-to-back direction from the previous location."]) Furthermore, the proposed billboard is rotated more than 10 degrees from the previous position. (Zoning Ordinance, §§19.34.080, subds. (F)(4)(a), (c); 19.34.080, subd. (F)(4)(c) ["The position of the replacement billboard face shall not vary more than ten degrees of rotation from the previous position."]) Plaintiffs also contend the proposed billboard violates the Zoning Ordinance because the sign faces will be larger than the existing billboard faces. (Zoning Ordinance, §19.34.080, subd. (F)(5)(a) ["The addition of a second billboard face on an existing single-sided billboard . . . may be allowed . . . provided that the proposal complies with all . . . the following: [¶] a. The new billboard face is no larger than the existing billboard face. . . ."].)

18

It is undisputed the project exceeds the Zoning Ordinance's height, location and rotation limits for replacement billboards. (Resolution No. 13-4484, §7, subd. (a).) However, the city council's approval of the development agreement, Ordinance 13-921, and adoption of the zone map amendment, Ordinance 13-920, allow the project to deviate from the billboard standards. The zone map amendment places the project site in the development agreement overlay district. As a result, an overlay zoning district allows for development that conforms with the land use requirements of the applicable primary zoning district, while providing flexibility in the application of development standards. (Zoning Ordinance, §19.14.010.)

Notwithstanding the city's adoption of the development agreement and the zone map amendment, plaintiffs contend the project is inconsistent with the Zoning Ordinance. Plaintiffs argue the development agreement and placement of the property in the development agreement overlay zone does not cure the inconsistency. Plaintiffs rely on *Neighbors, supra,* 157 Cal.App.4th at pages 1008-1010, 1014-1015. However, *Neighbors* is inapposite.

In *Neighbors*, the owners sought permission from the county to use their agriculturally-zoned land as a wedding venue. (*Neighbors, supra,* 157 Cal.App.4th at pp. 1001-1002). The zoning ordinance did not allow for commercial use on the property with or without a conditional use permit. (*Id.* at p. 1002, fn. 2.) The supervisors board declined to adopt zoning ordinance amendments that would have added conditional uses such as weddings in the agriculturally-zoned district. (*Id.* at p. 1002.) Instead, the supervisors board adopted a development agreement that purported to grant the owners an exception to the zoning ordinance by allowing commercial events as conditional uses on the property. (*Id.* at p. 1003.)

In *Neighbors*, the Court of Appeal held the supervisors board's ad hoc exception, which placed the owners' land in a class by itself, violated the uniformity requirement in Government Code section 65852. (*Neighbors, supra,* 157 Cal.App.4th at pp. 1010, 1015.) Our Fifth Appellate District colleagues reasoned: "If a zoning scheme is like a contract, the uniformity requirement is like an enforcement clause, allowing parties to the

19

contract to challenge burdens unfairly imposed on them or benefits unfairly conferred on others. . . . [¶] By creating an ad hoc exception to benefit one parcel in this case – an exception that was not a rezoning or other amendment of the ordinance, not a conditional use permit in conformance with the ordinance, and not a proper variance— the county allowed this 'contract' to be broken. If the county had, for instance, rezoned the property, it would be declaring that the [owners'] property appropriately *belonged* in a different zone and was subject to all the rules and limitations applicable to the other parcels in the new zone. Others similarly situated could argue, at future rezonings, that their parcels also belong in a different zone. If the county had altered the zoning ordinance to allow commercial uses like the ones here at issue as conditional uses within the agricultural zone, it would necessarily have given other owners in the zone the opportunity to apply for conditional use permits allowing those uses." (*Id*. at p. 1009.)

In *Neighbors*, the county used a development agreement to grant an ad hoc exception to the owners. (*Neighbors, supra,* 157 Cal.App.4th at pp. 1003, 1014.) The county approved a development agreement and conditional use permit that allowed the owners to devote the property to a use prohibited by the zoning ordinance. (*Id.* at p. 1007.) The county did not amend its zoning ordinance or rezone the property by amending the zoning map. (*Id.* at pp. 1006-1007.) The *Neighbors* holding is limited to the situation where a development agreement grants an ad hoc exception to use restrictions in the existing zone, not a rezoning granted with conditions. (*Id.* at p. 1014.)

Unlike the property in *Neighbors*, the project site here is located in a primary zoning district that permits billboards. Furthermore, concurrent with the development agreement approval, the city council rezoned the project site by amending the zoning map to place the property into the development agreement overlay district. Contrary to plaintiffs' assertions, *Neighbors* does not require that standards within a development agreement overlay zone be uniform for all properties within that zone. Our Fifth Appellate District colleagues in *Neighbors* stressed: "It is easy to imagine circumstances in which a development agreement validly sets forth permitted land uses that are not identical with those in the current, applicable zoning ordinance. For example, an

20

agreement could set forth uses more restricted than in the zoning ordinance, perhaps as a part of a bargained exchange for something given or conceded by the local government. Alternatively, the agreement could set out uses beyond those allowed under the preexisting zoning ordinance if the agreement included or was accompanied by a rezoning or other amendment to the zoning ordinance." (*Neighbors, supra,* 157 Cal.App.4th at p. 1015.)

Here, the development agreement, accompanied by a zoning map amendment, validly permits the project to depart from the billboard standards in the Zoning Ordinance. As part of a bargained exchange, the city receives substantial and ongoing public benefits in return for allowing the project to depart from the Zoning Ordinance's billboard standards. Under the development agreement, the city receives the following benefits: payment of $10,500 to the city every four weeks with an annual adjustment for inflation; the city's option to use the billboard to advertise city-sponsored events at no cost on a space available basis; the city's option to request a "sign tag" be installed below the billboard faces to advertise Sunset Strip or city-sponsored events; and contribution of $5,000 annually to the Sunset Boulevard business improvement district. These public benefits support the city's decision to permit the project to depart from the billboard standards through the development agreement. Also, the Zoning Ordinance expressly allows the city to approve the project by placing the project site in the development agreement overlay district. Under the Zoning Ordinance, the development agreement overlay district provisions (§19.14.040) control over other conflicting zoning provisions including the billboard standards (§19.34.080, subd. (F)). (§19.14.020, subd. (C) ["In the event of any conflict between the provisions of this chapter and other requirements of this article, the provisions of this chapter shall control."])

Furthermore, under the Zoning Ordinance, the Sunset Specific Plan's standards and requirements supersede contrary billboard standards in section 19.34.080, subdivision (F)(4). (Zoning Ordinance, §19.68.050, subd. (C) ["When a specific plan is adopted for a geographic area, the specific plan's land use designations, standards and other requirements will supersede and control any contrary provisions of this title. Where

21

an adopted specific plan is silent, development within the specific plan area will be implemented pursuant to the development standards and procedures in this title. All subdivision, public works projects, development agreements, and other development-related activity within a specific plan zone must be consistent with the adopted specific plan for that area."]; Gov. Code, § 65455 [zoning ordinance must be consistent with specific plan].) We conclude the city did not abuse its discretion in determining the project is consistent with the Zoning Ordinance. (*San Francisco Tomorrow, supra,* 229 Cal.App.4th at p. 513; *Friends of Lagoon Valley, supra,* 154 Cal.App.4th at p. 816; *Endangered Habitats, supra,* 131 Cal.App.4th at p. 782.)

### D.  The Project Is Consistent with the Sunset Specific Plan

Plaintiffs argue the project approval is invalid because the project is inconsistent with the Sunset Specific Plan. As noted, Government Code section 65867.5, subdivision (b) provides:  "A development agreement shall not be approved unless the legislative body finds that the provisions of the agreement are consistent with the general plan and any applicable specific plan." (*Braude v. City of Los Angeles, supra,* 226 Cal.App.3d at p. 891.)  Plaintiffs contend the project violates the Sunset Specific Plan's height requirements because it is 14 feet taller than the existing billboard. The Sunset Specific Plan limits the height of the replacement billboard to the height of the existing billboard. (Sunset Specific Plan, p. 134, Part II. Section 1. Policies-8 I.1.b ["If the existing billboard is higher than the Sunset Specific Plan height limit for that site, it may be replaced exactly as is to the existing height as of May 15, 1996."]; Sunset Specific Plan, p. 137, Part II. Section 1. Policies-8 I.5.b ["Height- Existing billboards may be replaced only up to the height of the existing billboard. . . ."].)  In addition, the Sunset Specific Plan limits the replacement billboard to a maximum height of 45 feet if the billboard is repositioned to change the view angle. (Sunset Specific Plan, p. 134, Part II. Section 1. Policies-8 I.1.c ["If the billboard is repositioned to change the view angle, it must be brought into compliance with the Sunset Specific Plan Height Limit for that site."].)

22

But the city may approve a project that exceeds the Sunset Specific Plan's billboard height requirements under its alternative proposal provision for billboards and art advertising. The alternative proposal provision states, "All projects are subject to the applicable design and development requirements, guidelines, and standards listed in this plan; however, the City retains discretion to approve an alternative proposal upon a showing that the alternative proposal furthers the goals stated by this plan, *and is consistent with the purpose and intent of the design and development requirements, guidelines, and standards that would otherwise apply to the project.*" (Sunset Specific Plan, p. 140, Part II. Section 1. Policies-8; italics in original.) Notwithstanding this provision, plaintiffs argue the city's findings of consistency do not conform to the requirements of the clause.

Plaintiffs assert the city did not make any finding that the project is consistent with the purpose and intent of the Sunset Specific Plan' design and development requirements, guidelines and standards. Not so. The city council made consistency findings in section 7, subdivision (b) of Resolution No. 13-4484. Resolution No. 13-4484 states: "Although the proposed replacement billboard departs from the standards of the [Sunset Specific Plan] with regards to the allowed height, with the top edge of the sign increasing from 54 feet to 68 feet, it remains consistent with the overall urban design vision, goals and objectives of the [Sunset Specific Plan]. The [Sunset Specific Plan] allows the City to retain the discretion to approve alternative proposals, provided that the alternative would be consistent with the goals stated by the Plan and the purpose and intent of the design and development requirements, guidelines, and standards. . . . The proposal is consistent with the purpose and intent of the design and development standards in that it enhances the visual mixture on Sunset Boulevard, where billboards are encouraged, creating a more vibrant environment. [Sunset Specific Plan] Page 134, Section I.1.b provides that the [Sunset Specific Plan] supports billboard replacement on single-pole structures with repositioning of the angles of the face to take advantage of view angles."

In addition, the August 5, 2013 city staff report makes consistency findings in response to plaintiff's contention that the project is inconsistent with the general plan and

23

the Sunset Specific Plan. The staff report states: "The project is consistent with the Sunset Specific Plan as it allows for deviations from the standards. Specifically the plan states that 'All projects are subject to applicable design and development requirements, guidelines, and standards listed in this plan; however, the City retains discretion to approve an alternative proposal upon a showing that the alternative proposal furthers the goals stated by this plan and is *consistent with the purpose and intent of the design and development requirements, guidelines, and standards that would otherwise apply to the project.*' The proposed replacement billboard furthers the goals of the Sunset Specific Plan by encouraging the construction and operation of billboards as a 'major urban design feature' along Sunset Boulevard and as a 'significant part of the street's visual character[.]' [¶] The Project is consistent with the General Plan, because it consists of a billboard Project that has a strong public benefit, adds to the City's image, and stimulates the local economy (see Goal LU-16). . . . [¶] The Project is consistent with the policies and intent of the [Sunset Specific Plan]. [¶] The Project furthers the goal of the [Sunset Specific Plan] by enhancing the excitement of the Sunset Strip without detracting from the existing visual aesthetics. [¶] The [Sunset Specific Plan] states that 'Billboards are one of the signature features of the Sunset Strip.' (Page 134) Maintaining the billboards is keeping in line with creating these signature features. [¶] The Project is consistent with the intent and purpose of the [Sunset Specific Plan] in that it enhances the visual mixture on Sunset Boulevard, where billboards are encouraged, creating a more vibrant environment. [¶] The Project is consistent with Part II. Section 1. Policies-8 I.1.b of the [Sunset Specific Plan], which supports billboard replacement on single pole structures with repositioning of the angles of the face to take advantage of view angles. The revised angle of the Project takes advantage of view angles. [¶] The new angle of the billboards will minimize any obstruction of views from the adjacent properties, since the back of the billboards will no longer be visible to properties to the north, in accordance with Part II. Section 1. Policies-8 I.1.d. [¶] The size of each billboard face is consistent with the [Sunset Specific Plan's] policy that 'billboard size should use the industry standard of 14 feet high by 48 feet wide.' (Part II. Section 1. Policies-8 5.a.) [¶] The Project is

24

consistent with the goals in the [Sunset Specific Plan] related to economic development because it will provide *extraordinary monetary benefits to the City*." (Italics added.)

In addition, the April 21, 2011 planning commission staff report also makes consistency findings. The planning commission staff report states: "[T]he [Sunset Specific Plan] allows for deviations from its standards if the City finds the proposal furthers the goals of the plan. The proposed replacement billboard minimizes the obstruction of views and ensures compatibility with the [Sunset Specific Plan]." In summary, the staff report finds, "[T]he proposed project is consistent with the Goals, Objectives and Policies of the General Plan and Sunset Specific Plan." The consistency finding as to the Sunset Specific Plan's policies necessarily includes the height requirements. This is because the design requirements, guidelines and standards are set forth under the Sunset Specific Plan's "Policies" section. (See Sunset Specific Plan, pp. 134, 137-138, Part II. Section 1. Policies-8 I.1 & I.5.)

We also reject plaintiffs' contention that the billboard height limits in the Sunset Specific Plan are mandatory as a matter of law. Plaintiffs rely on: *Endangered Habitats, supra,* 131 Cal.App.4th at pages 782-783; *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1338-1342 (*Families Unafraid*); and *Orinda Association v. Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1162-1167. *Orinda Association, supra,* 182 Cal.App.3d at pages 1162 through 1167, concerns a county's grant of a height variance from a zoning ordinance. *Orinda Association* is inapplicable because here the city did not grant a variance from the Zoning Ordinance. Likewise, *Endangered Habitats* and *Families Unafraid* are distinguishable. In *Endangered Habitats*, the project was inconsistent with the general plan because the county relied on an alternative methodology rather than the specific traffic analysis methodology required by the general plan policy. (*Endangered Habitats, supra,* 131 Cal.App.4th at p. 783.) In *Families Unafraid*, the project was inconsistent with the fundamental, mandatory and specific land use policy in the draft general plan. (*Families Unafraid, supra,* 62 Cal.App.4th at p. 1342.) Unlike the mandatory general plan policies in *Endangered Habitats* and *Families Unafraid*, the Sunset Specific Plan's alternative

25

proposal provision allows the city discretion to approve a project that departs from the plan's height policies. (*San Francisco Tomorrow, supra,* 229 Cal.App.4th at pp. 517-520; *Friends of Lagoon, supra,* 154 Cal.App.4th at pp. 820-822. )

In reviewing the city's consistency findings, we are mindful that state law does not require perfect conformity between the project and the general or specific plan. (*San Francisco Tomorrow, supra,* 229 Cal.App.4th at p. 514*; Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563 (*Pfeiffer*); *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510-1511.) As explained by the First Appellate District, Division One in *Sierra Club v. County of Napa, supra,* 121 Cal.App.4th at pages 1510 through 511: "[G]eneral and specific plans attempt to balance a range of competing interests. It follows that it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. An agency, therefore, has discretion to approve a plan even if the plan is not consistent with all of a specific plan's policies. It is enough that the proposed project is compatible with the objectives, policies, general land uses and programs specified in the applicable plan. [Citations.]" (Accord, *San Francisco Tomorrow, supra,* 229 Cal.App.4th at p. 514; *Pfeiffer, supra,* 200 Cal.App.4th at p. 1563.)

Here, the project is inconsistent with the Sunset Specific Plan's policy concerning the height requirements for replacement billboards. But the project conforms with other Sunset Specific Plan policies. The project is consistent with the Sunset Specific Plan's support of billboard replacement on a single pole structure with repositioning of the face angles to take advantage of view angles. (Sunset Specific Plan, p. 134, Part II. Section 1. Policies-8 I.1.b.) And the new angle of the replacement billboards minimizes any obstruction of views from the adjacent properties because the back of the billboards will no longer be visible to properties to the north. (Sunset Specific Plan, p. 134, Part II. Section 1. Policies-8 I.1.d.) Also, the size of each billboard face is consistent with the Sunset Specific Plan's policy that "billboard size should use the industry standard of 14 feet high by 48 feet wide" as a guideline. And the billboard size faces are consistent with the policy, "Small billboards are not encouraged." (Sunset Specific Plan, p. 137, Part II.

26

Section 1. Policies-8 I.5.a.)  Furthermore, the project does not negatively impact public views.  (Sunset Specific Plan, p. 134, Part II. Section 1. Policies-8 I.5.c.)  We conclude the city officials considered the applicable policies and the extent to which the project conforms with those policies.  (*San Francisco Tomorrow, supra,* 229 Cal.App.4th at p. 514*; Sierra Club v. County of Napa, supra,* 121 Cal.App.4th at pp. 1509-1510; *San Franciscans Upholding the Downtown Plan, supra,*102 Cal.App.4th at p. 678.)  We give substantial deference to the city's decisions and find no abuse of discretion.

Plaintiffs also contend the city's finding that the project furthers the Sunset Specific Plan goals is not supported by substantial evidence.  We disagree.  The Sunset Specific Plan sets forth two goals pertinent to this case:  "I.  Encourage maintenance and location of existing and proposed billboards.  [¶]  II.  Legalize existing billboards, and allow for creative billboards which will enhance the excitement of Sunset Strip without detracting from existing visual aesthetics or interfering with views."  (Sunset Specific Plan, p. 133, Part II. Section 1. Policies-8.)  The city made findings as to both Sunset Specific Plan goals.  In section 7, subdivision (b) of Resolution No. 13-4484, the city council found:  "Although the proposed replacement billboard departs from the standards of the [Sunset Specific Plan] with regards to the allowed height, with the top edge of the sign increasing from 54 feet to 68 feet, it remains consistent with the overall urban design vision, goals and objectives of the [Sunset Specific Plan].  The [Sunset Specific Plan] allows the City to retain the discretion to approve alternative proposals, provided that the alternative would be consistent with the goals stated by the Plan and the purpose and intent of the design and development requirements, guidelines, and standards.  This proposal furthers the goal of the Sunset Specific Plan by enhancing the excitement of the Sunset Strip without detracting from existing visual aesthetics."  In addition, the April 21, 2011 staff report states:  "[T]he [Sunset Specific Plan] allows for deviations from its standards if the City finds the proposal furthers the goals of the plan. . . .  The billboard is compatible with the related context of Geographic Area 4-F and furthers the goals of the Sunset Specific Plan by encouraging the construction and operation of billboards as a

27

'major urban design feature' along Sunset Boulevard and as a 'significant part of the street's visual character[.]'"

Also, the August 5, 2013 city staff report supports the city's findings that the project furthers the Sunset Specific Plan goals. The city staff report states: "The Project presents no new impacts to public scenic views. Sunset Boulevard has, by design, numerous billboards within the City of West Hollywood. Those billboards are part of the character of Sunset Boulevard. The Project is consistent with the types of views that the City is encouraging along Sunset Boulevard. [¶] The increase in height of the Project will not change the character of the views and no particular vantage point will be changed with the relocation of the billboard. Today, one can see both faces of the billboard from Sunset Boulevard and the residences to the north can see the entire back face of the billboards. Under the new configuration, from Sunset one will continue to see the faces of the billboard. The residences to the north will actually see less area of the billboard because it will be more perpendicular to those residences. . . . The view from the north will further be improved with the increased height."

Furthermore, before voting to approve the project, Councilmember Prang stated: "The [existing] billboard has negative community impacts if you live in the hills. It impacts your view. Parts of it are old and weathered and need to be replaced. While this billboard will be larger and a little taller, its configuration will actually improve the impact that it has on visibility to the hills, from the hills, and driving along Sunset Boulevard." Substantial evidence supports the city council's findings that the project will further the Sunset Specific Plan goals of: "encourage[ing] maintenance and location of existing and proposed billboards"; allowing billboards that "will enhance the excitement of Sunset Strip"; and doing so "without detracting from the visual aesthetics or interfering with views." (Sunset Specific Plan, p. 133, Part II. Section 1. Policies-8.)

Plaintiffs concede the city found the project furthers the Sunset Specific Plan's goal of "enhance[ing] the excitement of Sunset Strip" but argue this objective is inapplicable. The second Sunset Specific Plan goal states, "Legalize existing billboards, and allow for creative billboards which will enhance the excitement of Sunset Strip

28

without detracting from existing visual aesthetics or interfering with views." (Sunset Specific Plan, p. 133, Part II. Section 1. Policies-8.) Plaintiffs assert this goal is limited to creative billboards which are a defined category in the Sunset Specific Plan. The Sunset Specific Plan defines "creative billboards" and permit them under a creative billboard application process. (Sunset Specific Plan, p. 135, Part II. Section 1. Policies-8. I.3 ["Creative Billboard shall mean a billboard which may incorporate elements such as enlarged size, irregular shape, flashing lights, moving parts[,] inflated additions, electronic media, participatory attributes, three dimensional or structural projections and or other unusual characteristics that would substantially differ from a traditional flat surface billboard of standard size."].)

We reject plaintiffs' rigid reading of the second Sunset Specific Plan goal to apply only to creative billboards as defined in that plan. Read in a common sense fashion, the second goal of "enhance[ing] the excitement of Sunset Strip" applies to both existing and creative billboards. Moreover, even if we accept plaintiffs' narrow reading of the second Sunset Specific Plan goal, plaintiffs have not met their burden of showing the city abused its discretion. The record supports the city's finding that project furthers the goal of "encourage[ing] maintenance and location of existing and proposed" billboards. Thus, the city council may legally approve a different billboard height under the Sunset Specific Plan's alternative proposal provision. And this is because the project furthers the first Sunset Specific Plan goal. The city council did not abuse its discretion in finding the project is consistent with the Sunset Specific Plan.

## V.  DISPOSITION

The judgment is affirmed.  Defendants, City of West Hollywood and City Council of the City of West Hollywood, and real parties in interest, Ace Outdoor Advertising, LLC, Abraham Moradzadeh, Madlen Moradzadeh, and the Moradzadeh Family Trust, are awarded costs on appeal from plaintiffs, G.G. Verone and West Hollywood Citizens Against Billboard Blight.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

KRIEGLER, J.