Filed 4/11/23  In re Cristela M. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re CRISTELA M., a Person Coming Under the Juvenile Court Law. | B321968 (Los Angeles County Super. Ct. No. 20CCJP03749B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CRISTELA R., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela Shapiro, Juvenile Court Referee. Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant Cristela R.

Arezoo Pichvai for Plaintiff and Respondent.

_____

**INTRODUCTION**

Cristela R. appeals from a juvenile court order under Welfare and Institutions Code section 366.26 terminating her parental rights to her daughter, Cristela M. (Cristela).[1] Cristela R. argues the juvenile court erred in ruling the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i), did not apply. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.      *The Juvenile Court Sustains a Petition and Places Cristela with the Father of Her Half-brother*

Cristela R. has three children: Edgar, Cristela, and Vanessa. Edgar's father is Edgar M. (Edgar Sr.). Cristela R. was living with Edgar Sr. when Cristela was conceived, but Cristela's biological father is Juan G., who is also the father of Vanessa. This appeal concerns only Cristela.

On July 14, 2020 the Los Angeles County Department of Children and Family Services filed a petition alleging jurisdiction over Edgar, Cristela, and Vanessa under section 300, subdivisions (a), (b), and (j), based on life-threatening,

_____

[1]      Statutory references are to the Welfare and Institutions Code.

2

non-accidental injuries Vanessa suffered in the home and on the history of domestic violence between Cristela R. and Juan. The petition also sought jurisdiction over Vanessa under section 300, subdivision (e). At the time the Department filed the petition, Edgar was 13 years old and lived primarily with Edgar Sr., who shared custody of Edgar with Cristela R. Cristela, who was 18 months old, and Vanessa, who was six months old, lived with Cristela R. and Juan. For the first seven to eight months of Cristela's life, Edgar Sr. visited Cristela regularly because he believed (incorrectly, it turned out) she was his biological daughter.

The juvenile court detained all three children and released Edgar to Edgar Sr., with monitored visitation for Cristela R. Edgar Sr. expressed interest in having Cristela placed with him as well, and on July 24, 2020 the Department moved Cristela from a foster placement to Edgar Sr.'s home. Vanessa remained hospitalized under a medical hold because of her extensive injuries.

On May 10, 2021 the juvenile court sustained the counts relating to Cristela as alleged under section 300, subdivisions (a) and (j), and dismissed the counts alleged under section 300, subdivision (b). At a disposition hearing on October 27, 2021 the juvenile court declared Cristela a dependent child of the court, removed her from her parents' custody, and denied family reunification services under section 361.5. The court also declared Edgar a dependent child of the court, released him to Edgar Sr., and terminated jurisdiction over Edgar with a custody and visitation order granting Cristela R. monitored visits.

B. *Cristela Remains Placed with Edgar Sr., and Cristela R. Visits Cristela Regularly*

Cristela R. consistently visited Cristela and Edgar once a week for four hours. Cristela's maternal grandmother Liliana monitored the visits, which included playing at a park, painting, and "other fun activities." During visits Cristela R. changed Cristela's diapers, fed her, played with her, and allowed her to rest when she became tired. Cristela R. said she felt "she create[d] memories with [Cristela] at every single visit." A case social worker observed Cristela tended "to gravitate to [Liliana] when she has a need" and interacted more with Liliana than with Cristela R. Liliana told a case social worker that Cristela sought comfort from whoever was closest to her. The case social worker reported that Cristela appeared to see Liliana "more as a mother figure" and Cristela R. as "more of a friend, aunt, or other relative."

Cristela R. said she sometimes found it "difficult to drop off [Cristela], as [Cristela] does not like to see her leave." Liliana reported that Cristela sometimes seemed "emotional" at the end of visits with her mother, as if she might not be ready for the visits to end, but that she was no longer emotional by the time she arrived at Edgar Sr.'s house. Liliana said Cristela did not cry when Cristela returned to Edgar Sr.'s home, and instead appeared "happy to return to the home." A case social worker also reported that Cristela did not "show any emotions such as crying" and easily transitioned from being with Cristela R. and Liliana to Edgar Sr.

Edgar Sr. said he never observed Cristela "sad or crying" after visits with Cristela R. Instead, when Cristela returned home she ran to Edgar Sr., hugged him, and said "she missed

4

him." Edgar Sr. stated that Cristela never said she missed her mother, that she asked more about Liliana, and that she appeared to have a stronger bond with Liliana than Cristela R. On one occasion Cristela R. brought Edgar and Cristela home from a visit two hours early. Edgar told his father that he and Cristela R. disagreed about where to eat. Edgar Sr. said Cristela R. asked him to reduce her hours of visitation. A case social worker reported that Cristela R. was "reactive and oppositional" and did not use the parenting skills she may have learned to resolve the disagreement with Edgar.

Edgar Sr. also reported that the only clothing or other necessities Cristela R. ever brought Cristela was a single pair of shoes and that Cristela R. never inquired about Cristela's medical appointments. In February 2022 Edgar Sr. asked a case social worker to have Cristela assessed for "attachment issues" because Cristela was calling women other than Cristela R. "mommy." Edgar Sr. said Cristela called her mother "Cristela" for a long time but transitioned to calling her "'Mommy Cristela.'" Edgar Sr. said Cristela called him "daddy" and did not call any other men "daddy."

A case social worker reported that Edgar Sr. generally met Cristela's "physical, emotional, medical, and educational needs." The social worker also reported that Cristela had a strong attachment to Edgar Sr. and was comfortable in his care and that Cristela had a "strong bond" with her brother Edgar and with Edgar Sr.'s family, including Edgar Sr.'s mother, whom Cristela called "'mama Coco.'" The Department reported that Cristela thrived "with her prospective adoptive parent and his family, who continue to provide her with a safe and stable environment and home life."

C.   *The Juvenile Court Terminates Cristela R.'s Parental Rights to Cristela, and Cristela R. Appeals*

At the June 30, 2022 selection and implementation hearing under section 366.26, counsel for the Department and counsel for Cristela asked the juvenile court to terminate Cristela R.'s parental rights and to find Cristela was likely to be adopted. Counsel for Cristela R. argued the parental-benefit exception applied because Cristela R. visited regularly with Cristela, Cristela had an "excellent relationship" with Cristela R., and terminating parental rights would be detrimental to Cristela. Specifically, counsel for Cristela R. argued severing the relationship among Cristela R., Cristela, and Edgar would be detrimental to Cristela. For example, counsel stated, Cristela R. testified Cristela might have "mommy issues" if the court terminated Cristela R.'s parental rights because it would be difficult for Cristela R. to tell Edgar not to let Cristela see him leave with Cristela R. for visits. Counsel for Cristela R. suggested legal guardianship would provide Cristela the permanence she needed and would "keep her relationship on equal footing with her brother Edgar."

The juvenile court ruled that Cristela was likely to be adopted and that the parental-benefit exception did not apply.[2] The court acknowledged that Cristela R. regularly visited with Cristela and "spen[t] some good time" with her, but found that

---

[2] The juvenile court also denied Cristela R.'s petition under section 388 seeking to change the court's prior order denying reunification services. Cristela R.'s notice of appeal states she is appealing from the court's order denying her section 388 petition, but she does not address that order or suggest any basis for reversing it.

"the consistency, stability, and relationships that Cristela has in the home with [Edgar Sr.] outweigh the benefit of the relationship between Cristela and [Cristela R.]." The court considered the consistency and duration of Cristela's placement with Edgar Sr., the nature of Cristela R.'s relationship with Cristela, the potential for "an ongoing fight for custody of Cristela," and the effect terminating Cristela R.'s parental rights would have on Liliana's relationship with Cristela. The court also considered the unusual circumstance that Cristela R. would continue to visit Edgar, who lived with Cristela. The court said "no one really addressed that" issue except for Cristela R.'s "wondering today under oath what's going to happen when she goes to visit Edgar." The court stated it could not "require or order" the relationship between Cristela and Cristela R. to continue after terminating Cristela R.'s parental rights, but the court "beseech[ed]" Edgar Sr. and his mother "to find a way to have [Cristela R. and Liliana] continue to be a part of Cristela's life, to be able to see her, to be able to visit with her, and to not exclude her."

Cristela R. timely appealed. She argues the juvenile court abused its discretion in ruling the parental-benefit exception did not apply. That argument lacks merit.

## DISCUSSION

A.    *Applicable Law and Standard of Review*
The purpose of a hearing under section 366.26 is "'to select and implement a permanent plan for the child'" after the juvenile court has terminated reunification services. (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*); see *In re D.M.* (2021)

71 Cal.App.5th 261, 268.)  If the court determines "the child is likely to be adopted," the court must "terminate parental rights to allow for adoption." (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1).)  "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630-631; see § 366.26, subd. (c)(1)(B), (4)(A).)  One of those reasons, the parental-benefit exception, requires the parent to establish by a preponderance of the evidence (1) "the parent has regularly visited with the child," (2) "the child would benefit from continuing the relationship," and (3) "terminating the relationship would be detrimental to the child." (*Caden C.,* at p. 629; see § 366.26, subd. (c)(1)(B)(i); *D.M.*, at p. 268.)

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra,* 11 Cal.5th at p. 632; see *In re A.L.* (2022) 73 Cal.App.5th 1131, 1151.)  To establish the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra,* 11 Cal.5th at p. 636; see *In re J.D.* (2021) 70 Cal.App.5th 833, 852.)  The Department concedes Cristela R. proved the first two elements.

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption.  [Citations.]  Because terminating parental rights eliminates any legal basis for the

parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1151.)

The Supreme Court in *Caden C.* explained that "understanding the harm associated with severing the relationship is a subtle enterprise." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) In each case, "the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]'" (*Id.* at p. 633.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home. [Citation.] A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship." (*Id.* at p. 634.) "When the relationship

9

with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633-634; see § 366.26, subd. (c)(1)(B)(i).)

In considering the third element, the "court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision . . . is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640; see *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 206.)

> B. *The Trial Court Did Not Abuse Its Discretion in Ruling the Benefits of Adoption Outweighed the Detriment of Terminating Cristela R.'s Parental Rights*

Cristela R. argues the juvenile court abused its discretion in finding the benefits of adoption for Cristela outweighed the detriment of losing her relationship with her mother. She contends Cristela "would be confused by [her] Mother continuing to visit with Edgar, but not with her." And Cristela R. argues that, if the court did not terminate her relationship with Cristela, Cristela would "never have to try to understand why [her] Mother is still Edgar's mother" but not hers. Cristela R. argues having to "come to terms" with this situation "could only be detrimental" to Cristela.

It is possible Cristela could experience some confusion if she saw Cristela R. visiting Edgar but not her or if Edgar Sr. refused to allow Cristela to visit with Cristela R. when she came to visit Edgar (if Edgar Sr. took that position, which he never

10

has).  Confusion, however, is not detriment, and Cristela R. did not introduce any evidence on the issue of detriment, other than her concern about Cristela's potential confusion.  Cristela R.'s speculation that Cristela might be confused and that her confusion would cause sufficient detriment to overcome the benefits of adoption was not evidence.  (See *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 834, fn. 13 ["speculation does not establish an abuse of discretion"]; cf. *In re Travis J.* (2013) 222 Cal.App.4th 187, 204 [juvenile court "abused its discretion" by basing its order "on nothing more than speculation"]; see also *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046 [inferences based on speculation or conjecture are not substantial evidence].)

Moreover, the juvenile court, when it weighed the benefits of adoption against terminating Cristela's parental rights, recognized Edgar's ongoing relationship with Cristela R. was a "unique situation" and considered the possibility Cristela would experience some confusion.  The court acknowledged that Edgar and Cristela live in the same house and that Cristela R. "is going to continue to see Edgar and have visits with him."  The juvenile court even encouraged Edgar Sr. to allow Cristela R. to visit with Cristela when she visited Edgar, presumably to avoid the kind of potential consequences Cristela R. identified.  The juvenile court, however, concluded ending Cristela's relationship with her mother, despite the benefits of that relationship, would not harm Cristela "to an extent not outweighed, on balance, by the security of a new, adoptive home" with Edgar Sr. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  The court stated that Cristela turned to her grandmother, not Cristela R., "for validation and to help her" and that all the evidence, other than Cristela R.'s testimony,

11

suggested Cristela was not emotionally attached to Cristela R. Having made the "subtle, case-specific inquiry" required by *Caden C.*, the trial court did not abuse its discretion. (See *id.* at p. 633.)

Citing *In re Jerome D.* (2000) 84 Cal.App.4th 1200, Cristela R. argues making Cristela the "'odd child out'" in Edgar Sr.'s home would be detrimental to Cristela. *Jerome D.* is distinguishable. The court in *Jerome D.* held the juvenile court abused its discretion in terminating the mother's parental rights over her nine-year-old son who was "the stepchild or 'the odd child out'" in his stepfather's home, had lived with his mother for six-and-a-half years, and expressed a desire to live with his mother again. (*Id.* at p. 1206.) A psychologist testified that the child and his mother "shared a 'strong and well[-]developed' parent-child relationship and a 'close attachment' approaching a primary bond" and that the child would "grieve and could experience emotional and behavioral difficulties" if the court severed his relationship with his mother. (*Id.* at pp. 1207-1208.) There was no such evidence here. By the time of the section 366.26 hearing, Cristela had lived with Edgar Sr. for more than half of her three and a half years, had a strong bond with him, and was thriving in his care. Cristela R. introduced no evidence, such as expert testimony or a bonding study, to show severing Cristela's relationship with her mother would have any detrimental effect. (See *In re M.M.* (2022) 81 Cal.App.5th 61, 68 ["A bonding study can be relevant at a hearing under section 366.26 to the question of whether the beneficial parent-child relationship exception should prevent the termination of parental rights."], review granted Oct. 12, 2022, S276099; *In re S.R.* (2009) 173 Cal.App.4th 864, 869 [same].)

Cristela R. also argues that "there is no evidence that Cristela will gain any more stability from being adopted by [Edgar Sr.] than she would by him becoming her legal guardian" and that there was no evidence Edgar Sr. "will suddenly refuse to care for Cristela if he cannot adopt her." The juvenile court, however, stated making Edgar Sr. Cristela's legal guardian could lead to custody issues that would be destabilizing for Cristela. Moreover, it was Cristela R.'s burden to prove by a preponderance of the evidence that terminating her relationship with Cristela would harm Cristela to such an extent that the detriment outweighed the benefits of adoption. Cristela R. did not submit any evidence legal guardianship would be as or more stable than adoption.

Finally, Cristela R. suggests the juvenile court erred in relying "on a promise" from Edgar Sr. (who was not present at the section 366.26 hearing) "there will be a future relationship between the child and the parent in analyzing the beneficial parent-child relationship exception." As stated, *Caden C.* requires the court to "assume that terminating parental rights terminates the relationship." (*Caden C., supra*, 11 Cal.5th at p. 633.) Thus, in determining whether to terminate parental rights, the court may not consider "the prospective adoptive parents' willingness to allow the children to have continued contact with mother." (*In re C.B.* (2010) 190 Cal.App.4th 102, 128; accord, *In re J.D., supra*, 70 Cal.App.5th at p. 866.) And the juvenile court followed the law. While "beseech[ing]" Edgar Sr. to continue to include Cristela R. and Liliana in Cristela's life, the court acknowledged that it was "without any power or jurisdiction" to order continued visitation and that "[n]o one is going to be able to expect [continued visitation] because of a

termination order."  Thus, the court did not err by considering Edgar Sr.'s willingness to allow Cristela R. to visit with Cristela or by attempting to extract a promise from him to do so.  Instead, the court terminated Cristela R.'s parental rights despite knowing continued visits might not occur.

## DISPOSITION

The order is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.

14